UNITED STATES of America, Plaintiff,

v.

OWENS CONTRACTING SERVICES, INC., and Frank J. Buscarino, Defendants.

No. 93–CV–10309–BC.

United States District Court, E.D. Michigan, Northern Division.

Dec. 14, 1994.

Janet L. Parker, Asst. U.S. Atty., Bay City, MI, Jeffrey M. Cox, Asst. Regional Counsel, EPA—Region 5, Chicago, IL, David S. Christensen, U.S. Dept. of Justice, Environmental Enforcement Section, Washington DC, for ·plaintiff.

James P. Boardman, Saginaw, MI, for defendant Owens Contracting.

Joseph H. Luplow, Saginaw, MI, for defendant Frank J. Buscarino.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

### I. Background

This case arises out of the demolition of a garage in Saginaw owned by Frank Buscarino ("Buscarino") and demolished by defendant Owens Contracting ("Owens"). The garage corresponded to a 10 unit apartment building, but was physically separate from it. The apartment building "was partially destroyed by fire [in July, 1989] and thereafter demolished [July 17, 1989 [1]]". *Resp. Br. of City of Saginaw*, p. 7.

On March 6, 1990, the City of Saginaw ordered Buscarino to demolish or repair the garage within 20 days because it found the garage to be "dangerous". On April 18, 1990, Buscarino contracted with defendant Owens for demolition of the garage. Owens demolished the garage between April 20 and May 3, 1990. The wooden walls of the garage were covered on the outside with "transite siding," which contains asbestos.

Owens used a "Hydra–Unit" to demolish the garage. "The Hydra–Unit had steel jaws at the end of a hydraulic-powered arm and moved about the site on two metal crawler tracks." *JFPTO*, pp. 12–13. "Owens loaded debris from the garage, including transite, into Owens' open semi-tractor trailer, using the jaws of the Hydra-unit." *JFPTO*, p. 13. The government contends that Owens "use[d] the Hydra–Unit to push the outside walls with the transite still on them into the center of the building, forming a large pile of debris and then 'drove over them repeatedly, crushing and pulverizing the transite laced debris and then proceeded to load the crushed and pulverized debris into a dump truck.'" *Pl. Br. in Support*, p. 9.

A Saginaw resident and employee of Mechanical Insulation Services, Inc. ("MIS"), Keith Anderson, telephoned the Michigan Department of Natural Resources Air Quality Division ("MDNR/AQD") and reported that demolition of the garage "was making the asbestos siding friable." *JFPTO*, p. 13. MDNR/AQD inspectors examined the demolition on April 21, 22, 23, 25, 26, 27 and May 1, and 3, 1990. *JFPTO*, p. 13. "Samples of transite siding taken during these inspections of the garage demolition were analyzed and reported to be between 10 to 20 percent asbestos" and "more than 1% asbestos by weight." *JFPTO*, p. 13.

No one submitted any written notice of intent to demolish the garage. *JFPTO*, p. 13. On April 25, 1990, MDNR/AQD "issued a letter of violation to Owens." *JFPTO*, p. 13. On May 3, 1990, MIS "arrived on the site to stabilize and clean up the site, billing Buscarino $20,000." *JFPTO*, p. 14.

At the time of the demolition, the garage [2] "contained used furniture, clothing and various other items." *JFPTO*, p. 12. These items were also described as "debris and junk and stuff from the house," *Resp. of City of Saginaw*, p. 8, quoting James Owens deposition, and "[o]ld mattresses, boxes of clothes, just trash more or less." *Id.* at 9, quoting Hall deposition. The garage was not locked: "[a]nybody could have opened them [the doors] or closed them at any time. There was [sic] no locks. It was not secured." *Id.* at 9, quoting Hall deposition. The government contends that the garage was used for commercial purposes (and thus, a commercial facility) because it was used in connection with the apartment building.

Defendant Owens contends that defendants did not receive a definite answer from the MDNR as to whether the National Emission Standard for Hazardous Air Pollutants ("NESHAP") applied to the instant demolition and thus, that imposition of penalties would be unfair. *Def. Br. in Support*, p. 9. The government responds that even if defendant did not know it was subject to the

---

1. *Exhibit A*, Def. Br.

2. As noted by the government, the building which is the subject of this suit has been referred to as a "garage" and a "storage building."

provisions of NESHAP, NESHAP imposes strict liability, i.e. liability without regard to fault or fairness. *Pl. Resp. Br.*, p. 9. The government is correct. *United States v. Sealtite Corp.*, 739 F.Supp. 464, 468 (E.D.Ark.1990).

The government moves for "partial" summary judgment because it seeks judgment as to liability only, and leaves the amount of penalty to be decided at a later date. Defendant Owens moves for complete summary judgment.

The government averred the following violations of the asbestos NESHAP in its complaint:

(1) notice violation under 40 C.F.R. § 61.146,

(2) work practice violation—failure to wet under 40 C.F.R. § 61.147(e)(1) and (g), and

(3) work practice violation—discharge of visible emissions under 40 C.F.R. § 61.152(b).

*Complaint*, pp. 10–12.

Defendant Buscarino also cross-claimed against defendant Owens in the event that Buscarino was held liable. *JFPTO*, p. 5. Based on the following order entering summary judgment for defendant Owens and Buscarino and denying plaintiff's motion for summary judgment, the court believes the cross-claim is moot.

As stipulated by the parties, the applicable regulations are those that were in place at the time of the demolition, i.e., the 1988 asbestos NESHAP which predated the 1990 amendments.[3] *JFPTO*, p. 2. Unless otherwise stated, the regulations cited in this opinion will be those applicable in the instant case.

Having read the briefs and materials submitted as well as having heard oral argument in this matter,[4] the issue is ripe for decision.

## II. Standard

Summary judgment is proper only where the moving party shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court is required to ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). The party opposing summary judgment must present "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 1479, citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Discussion

### A. Overview of NESHAP (pre-1990 amendments)

The Clean Air Act (42 U.S.C. §§ 7401 *et seq.*) authorizes the Administrator of the Environmental Protection Agency ("EPA") to promulgate standards for the handling of hazardous air pollutants. *United States v. Hugo Key and Son, Inc.*, 731 F.Supp. 1135, 1140 (D.R.I.1989). "The NESHAP for asbestos was promulgated in 1973 after extensive evaluation and public comment, and is currently set forth at 40 C.F.R. part 61, Subpart M." *Id.*

> [I]n order to establish liability under the Asbestos NESHAP, the government must establish that (1) the Clean Air Act and the Asbestos NESHAP apply to [defendant] and (2) that [defendant] failed to comply with requisite requirements.

*United States v. Midwest Suspension and Brake*, 824 F.Supp. 713, 725 (E.D.Mich.1993).

The notice requirements of § 61.146 apply to "[e]ach owner or operator to which this section applies." § 61.145 specifies various

---

3. The 1993 regulations reflect some changes made in 1991, but the sections applicable to this case were not changed between 1990 and 1993. Thus, for our purposes, the 1993 and 1990 regulations are interchangeable.

4. September 29, 1994.

work practice standards which apply to demolition operations, depending on the presence of listed "amount[s] of friable asbestos."

If a facility "is being demolished under an order of a State or local governmental agency, issued because the facility is structurally unsound and in danger of imminent collapse,[5] only the requirements in § 61.146 and in paragraphs (d), (e), (f), and (g) of § 61.147 apply." 40 C.F.R. § 61.145(c) (1988). Since the instant garage was ordered to be demolished by the City of Saginaw, the more lenient subsection (c) applies here.

## B. Amount of friable asbestos

The government contends that its "motion for partial summary judgment on liability is based on 40 C.F.R. § 145(c), relating to ordered demolitions." *Pl. Resp. Br.*, p. 14. The government states that "40 C.F.R. § 61.145(c), [ ] does not require *any* showing of *any* amount of asbestos for NESHAP applicability." *Pl. Resp. Br.*, p. 14.[6] Thus, the government concludes, "there is no need at this juncture to prove any amount of friable asbestos." *Pl. Resp. Br.*, p. 14. The government cites no case law in support of its reading of the regulations.

**5.** The court assumes that the order from the City of Saginaw dated March 6, 1990 (Exhibit M, *Pl. Br.*) which refers to the garage as a "dangerous building" suffices to render the instant demolition an "ordered demolition" under § 61.145(c). The government concedes that it does. *See, e.g., Pl. Resp. Br.*, p. 14; *Tr.* p. 47.

**6.** The government adhered to this argument during oral argument. *Tr.*, p. 47 ("if we come to trial, we'll prove the amount, we may come under 61.145A, we believe we can prove that. But since we felt we could easily—there was no dispute as to 61.146C, we came under that for the motion.").

**7.** At oral argument, the court inquired of the government whether the instant siding needed to be considered a facility component for purposes of NESHAP applicability. *Tr.*, p. 45. After consulting with the EPA representative, the government stated that "some of the work practices, there are some not involved here, do use the term facility component and some don't," "I don't see facility component in 65 [sic] .147el or g or 52b," "not every definition applies." *Tr.*, p. 45, p. 46, p. 46, respectively. The government also stated that "had our case been brought under 61.147D because if we had a 61.147D violation, that specifically talks about structural

As noted earlier, applicability of the asbestos NESHAP is defined in § 61.145. Subsection (a) speaks to the larger amounts of friable asbestos—"at least 80 linear meters (260 linear feet) on pipes or at least 15 square meters (160 square feet) on other facility components"[7]—for which "all the requirements of §§ 61.146 and 61.147 apply, except as provided in paragraph (c) of this section." § 61.145(a). § 61.146 sets forth notification requirements and § 61.147 sets forth emission control standards. Thus, where the amount of friable asbestos exceeds 80 linear meters on pipes (or 15 square meters on other facility components), the demolition operator must comply with notification and emission control standards.

Subsection (b) speaks to amounts of friable asbestos less than the 80 linear meters on pipes (or less than 15 square meters on other facility components) and provides that "only the requirements of paragraphs (a), (b), and (c)(1), (2), (3), (4), (5) of § 61.146 apply." Thus, if the amount of asbestos is less than 80 linear meters on pipes (or 15 square meters on other facility components), the demolition operation is required only to notify the

member. However, our case is under 61.147E . : ." *Tr.*, p. 49. This implies that the work practices which do not use the words "facility component" could apply even where no facility component exists. However, the applicability section (61.145) specifically refers to quantities of asbestos on pipes and "other facility components," thus, making it clear to the court that the regulations apply only where a certain quantity of asbestos *on facility components* is present. The regulations define facility component as "any pipe, duct, boiler, tank, reactor, or furnace at or in a facility; or any structural member." 61.141. Structural member is defined as "any load-supporting member of a facility, such as beams and load supporting walls; or any nonload-supporting member, such as ceilings and nonload-supporting walls." 61.141. Although the instant siding is arguably not a wall in and of itself, the court will assume that the siding becomes a part of the wall when affixed to it; that is, the court will assume that siding is to walls what insulation is to pipes. Therefore, the court assumes this threshold requirement is met, in spite of the government's urging that it is not necessary.

The court notes that under the new regulations the discussion of what is and what is not a facility component would hardly ever be necessary since it is broadly defined as "any part of a facility including equipment." 61.141 (1993).

Administrator. § 61.146. The asbestos NESHAP does not compel the demolition operators to do anything further.

§ 61.145(c) provides that "[i]f the facility is being demolished under an order of a State or local governmental agency, issued because the facility is structurally unsound and in danger of imminent collapse, only the requirements in § 61.146 and in paragraphs (d), (e), (f), and (g) of § 61.147 apply." § 61.147 sets forth standards for demolition and emissions control.[8]

■ Thus, where a court-ordered demolition involves a smaller amount of friable asbestos (§ 61.145(b)), the minimal notice requirements are not set aside, likely because compliance with the notice requirements takes little effort. However, where the court-ordered demolition involves a larger amount of asbestos (§ 61.145(a)), the preparatory emissions standards, which would normally apply, may be avoided. § 61.145(c); § 61.147(a) (removal of friable asbestos prior to demolition), § 61.147(c) (wetting friable asbestos materials before removal from the facility). Besides the urgency implicit in an ordered demolition, the government noted that to require removal of items from an unsafe building would expose the demolition crew to undue risk of injury. *Tr.*, p. 18.

It appears to the court that the regulatory scheme is a carefully planned one. § 61.145 addresses the applicability of the asbestos NESHAP, with subsections a and b setting forth the threshold amounts of friable asbestos which will invoke application of various work practice standards. Then, subsections c and d address the unique situations where applicability will be further limited beyond those found in the first two sections defining threshold amounts.

■ Assuming, *arguendo*, that the siding contained friable asbestos, the defendants' liability depends on the amount of asbestos present. If the amount is less than 15 square meters on facility components (other than pipes), then only the notice requirements apply. § 61.145(b); § 61.146(a)–(c). Thus, only Count I would be feasible. If the amount of friable asbestos is over 15 square meters on facility components (other than pipes), then the notification requirements of § 61.146 and the emission standards of § 61.147(d)–(g) could apply, rendering Counts I and II of the complaint feasible.[9] No matter the amount of asbestos, § 61.152(b) would not be applicable where the demolition is court-ordered. § 61.145(c) (where the demolition occurs pursuant to order of a State or local agency, "only the requirements in § 61.146 and in paragraphs (d), (e), (f), and (g) of § 61.147 apply.").

The government's position ignores the cohesive scheme and argues that since no amount of friable asbestos is stated in subsection c, no amount need be shown before applying all the work practice standards listed in that subsection. *Pl. Resp. Br.*, p. 14; *Tr.*, p. 47.[10]

Taking the government's argument to the extreme to illuminate its absurdity, an intended demolition of a building containing one square millimeter of friable asbestos would not be subject to any requirements of the asbestos NESHAP other than the notice standards, but would become subject to *all* the emissions standards of the asbestos NESHAP upon entry of a court order requiring its demolition. This cannot be so.

Accepting the government's proposed reading would lead to an incongruous and

8. Subsection d addresses renovations where at least 80 linear meters of asbestos on pipes (or at least 15 square meters on other facility components) are present.

9. Count I—§ 61.146 (notice); Count II—§ 61.147(e)(1) and (g); Count III—§ 61.152(b).

10. In its brief, the government tangentially notes that it does "request summary judgment at least as to 40 C.F.R. § 61.145(b) for Owens' violation of the notice requirement, and reserved its rights to prove in a later proceeding, if necessary, that

the demolition involved over 160 square feet of friable asbestos." *Pl. Resp. Br.*, p. 14, n. 16. This appears to be some recognition that application of the work practice standards (beyond notification) requires proof of an amount over 15 square meters (160 square feet). However, the government's "reservation of right" to produce evidence at a later date while seeking summary judgment as to liability in general requests the court turn the summary judgment standard on its head. *Street*, 886 F.2d at 1479; Fed.R.Civ.P. 56(c). The court will not indulge that request.

absurd result. "It goes without saying that, in construing a statute or regulation, we seek to avoid imposing such results." *Gregory v. Missouri Pac. R.R.*, 32 F.3d 160, 165 (5th Cir.1994) (finding proposed reading that "regulation would be violated every time a train operated in the rain" to be absurd and illogical); *Bethlehem Mines Corp. v. Henderson*, 939 F.2d 143, 149–150 (4th Cir. 1991) (finding proposed reading of regulation that would allow twenty day rule for submission of evidence to be circumvented by calling primary evidence "responsive" to be absurd). Absent authority to support the government's reading, the court will not interpret subsection (c) in the transmuted manner proposed by the government.

In support of its "no threshold amount" argument, and elsewhere, the government repeatedly referred to what is portrayed as Congress's finding that "there is no level of exposure to asbestos that is deemed safe." *Tr.*, p. 13; *see also, Tr.*, pp. 81–82 ("Congress had found through from the nineteen forties that there was no safe amount of asbestos.").[11] This could very well be true; however, the level of safe asbestos, that is, what the *regulations* *should* have stated, is not the issue before the court. The issue here is whether the regulations apply to the instant demolition. Sub-issues include whether any minimum amount of friable asbestos must be shown to have been present before certain work practice standards of the asbestos NESHAP apply, and if so, whether that amount has been shown to have existed.

As to the amount issue alone, Count I could survive because it does not require any minimum amount to be proven, Count II could not survive absent proof that over 15 square meters of friable asbestos was pres-

ent, and Count III could not survive under any circumstances because § 61.152 is not one of the listed exclusive requirements where demolition occurs pursuant to local order, § 61.145(c).

Assuming, *arguendo*, that the government could prove the minimum amount of friable asbestos [12] was present in the transite siding to enable Count II's survival,[13] the government's case is fatally flawed in other respects and would still require the granting of summary judgment in favor of defendants for the reasons stated below.

## C. Owner/operator and stationary source

■ Only owners or operators are liable under the asbestos NESHAP. Owner or operator is defined as "any person who owns, leases, operates, controls, or supervises a stationary source." 40 C.F.R. § 61.02 (1988). "A stationary source under the Act [Clean Air Act] is 'any building, structure, facility, or installation which emits or may emit any air pollutant.' 42 U.S.C. § 7411(a)(3)." *United States v. Walsh*, 8 F.3d 659, 663 (9th Cir.1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994).

> The stationary source in this case is the demolition or renovation operation. The demolition or renovation contractor would clearly be considered an owner or operator by 'operating' the stationary source. The facility owner or operator, by purchasing the services of the demolition or renovation contractor, acquires ownership and control of the operation and would, therefore, be the 'owner' for purposes of this standard. Therefore, the standard applies to both the contractor and the facility owner or operator.

---

11. The court imagines that the government's contention is based on 20 U.S.C. § 4011(a)(3) wherein it states: "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed to the fibers ..." The court notes that failure to establish a safe minimum (which would be a commitment to a number which could later be proven erroneous) does not perforce equate to a finding that there simply is no safe level. However, even if it does equate to such a finding, the defendants cannot be held liable under a belief which was not codified into a regulation.

12. This assumption incorporates three other assumptions: that the government would ask the court to allow for supplementation of the record as to amount, that the court would exercise its discretion to allow such supplementation, and that any amount of asbestos was friable when the demolition commenced.

13. As noted earlier, Count I could also survive scrutiny at least as to amount.

*United States v. Geppert Bros., Inc.*, 638 F.Supp. 996, 999 (E.D.Pa.1986) (interpreting 40 C.F.R. § 61.145, 61.146, and 61.147); *in accord,* Hugo Key, 731 F.Supp. at 1141 ("the demolition contractor is, by definition, the owner or operator of the demolition operation.").

The garage was owned by Buscarino and was demolished by Owens. *Complaint,* ¶ 10; *Answer,* ¶ 10. Therefore, if the asbestos NESHAP applies, both Buscarino, as owner, and Owens, as operator, could be liable for any violation.

### D. Facility

■ The standards listed in the asbestos NESHAP apply to the demolition of facilities by owners or operators. Facility is defined in the asbestos NESHAP:

*Facility* means any institutional, commercial, or industrial structure, installation, or building (excluding apartment buildings having no more than four dwelling units).

40 C.F.R. § 61.141 (1988).[14]

The government contends that because the garage was used in connection with defendant Buscarino's apartment building (which contained over 4 units), the garage was used commercially. *Pl. Br. in support,* pp. 16–17. Thus, the government concludes that the garage was a facility subject to the strictures of the asbestos NESHAP. *Id.* At oral argument, the government added that even if the garage were disassociated from the apartment building, because the garage was used for business purposes (the storage of tenant's personalty), then it is a commercial facility (regardless of the number of units in the related apartment building). *Tr.,* pp. 36, 41.[15]

Defendants counter that since the apartment building had no asbestos-containing material, the apartment building was not subject to the asbestos NESHAP. *Def. Resp. Br.,* pp. 9–10. Defendants then conclude that if the apartment building was not subject to the asbestos NESHAP, then neither was the garage. *Id.*

Viewed in the light most favorable to the government, the court will assume that the asbestos NESHAP's applicability to the instant garage may be considered independently of whether the asbestos NESHAP would have applied to the attendant apartment building.

The issue then is whether the garage itself was an "institutional, commercial, or industrial structure." 40 C.F.R. § 61.141 (1988). The government argues that the garage was used for commercial purposes, relying on Frank Buscarino's affidavit, ¶ 4, and pages 33–34 of James Owens' deposition. *Pl.Resp. Br.,* p. 4. The portion of James Owens' testimony cited includes the following responses:

Just nothing but debris and junk and stuff from the house that was left in there and cardboard boxes. It was a semi load of junk in there, just junk.... Furniture, clothing.... We put the boiler in there. I put the boiler in there.... In the garage, stored it in there.... Yup, then removed it.... Two months, and then moved it.... When I hauled away the house [apartment building], I removed the boiler and stuck it in the garage.

*Deposition of James Owens,* pp. 33–34. The fact that "junk" and a boiler were transferred from a burned building into this garage is not probative of commercial use. Had the testimony indicated that the garage was the chosen storage building for items used in Buscarino's business, at least arguable commercial use would be indicated. However, the testimony cited above indicates that even the use of the garage for storage was by default rather than choice. Owens' testimony belies any purposeful connection between the garage and commerce; it cer-

---

**14.** The court notes that under the current regulations:

*Facility* means any institutional, commercial, public, industrial, or residential structure, installation, or building (including any structure, installation, or building containing condominiums or individual dwelling units operated as a residential cooperative, but excluding residential buildings having four or fewer dwelling units); any ship; and any active or inactive waste disposal site.

**15.** At first, government counsel stated that if the related apartment building had contained only three units, "[w]e wouldn't be before the court today." *Tr.,* 36.

tainly does not indicate a nexus between the two.

The other grounds for the government's conclusion that the garage was used commercially are those stated in Buscarino's affidavit. Buscarino states the following:

> The garage was generally used for commercial activities and purposes until it was demolished by Owens Contracting Services, Inc. ("Owens") in April and May, 1990.

*Affidavit of Frank Buscarino,* ¶ 4. Buscarino's *conclusion* that it was used for "commercial activities and purposes" is insufficient to create a genuine issue of material fact in response to defendant Owens' motion for summary judgment or to invincibly support the government's motion for summary judgment. *Industrial Risk Insurers v. Creole Production Services, Inc.,* 568 F.Supp. 1323, 1325 (D.Alaska 1983) (finding conclusory affidavits insufficient to satisfy the requirements of Fed.R.Civ.P. 56(e)), *aff'd,* 746 F.2d 526 (9th Cir.1984).

Examination of the statement in reference to the facts used to support the conclusion is revealing:

> The garage was used for the [sic] storage in connection with the operation of my nearby apartment building. I stored furniture, clothing, and other household effects that were left by tenants of the apartment building for at least one year in order to comply with the requirements of the Michigan Landlord–Tenant Act.

*Affidavit of Frank Buscarino,* ¶ 5. The garage was not used to store furniture that Buscarino would rotate for use in his apartment building (which would at least arguably be a use closer to commercial); it was used simply as a pre-salvage-yard purgatory.

After the demise of the apartment building, the only new use the garage acquired was again that of default storage for items (furnace and boiler) which survived the fire, the ultimate destination of which was unknown:

> After a fire occurred at the apartment building, I transferred various items from the apartment building, including a furnace or boiler. These items remained inside the garage until the garage was demolished by Owens. I continued to use the garage for storage until it was demolished.

*Affidavit of Frank Buscarino,* ¶ 8.

Storage of abandoned property in order to comply with the Michigan Landlord–Tenant Act (which Buscarino believes precludes a landlord from destroying tenants' property for one year) [16] and storage of items removed from a burned building do not appear to be the sort of "commercial" use rendering the garage a "commercial" "facility" under the asbestos NESHAP.

This conclusion is buttressed by reference to the rules of statutory construction. [17] Of course, the first tenet requires that "the words used in the regulation are to be given their plain and ordinary meaning." *Diaz,* 648 F.Supp. at 644. In addition, "the principle of *ejusdem generis* [ ] suggests that a general term should be understood in light of the specific terms that surround it." *Kurinsky, et al. v. United States, et al.,* 33 F.3d 594, 596 (6th Cir.1994). The terms "institutional, commercial, or industrial" all serve to explain the meaning of the general term "facility." Thus, the meaning given the specific terms of "institutional, commercial, or industrial" are indicative of the meaning to be attributed to "facility."

Furthermore, "[u]nder the principle of statutory construction known as *noscitur a sociis,* a general term is interpreted within the context of the accompanying words 'to avoid the giving of unintended breadth to the Acts of Congress.'" *Kurinsky,* 33 F.3d at 597, *quoting, Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). Here, under *noscitur a sociis,* the term "commercial" is interpreted in light of its neighbors, "industrial" and "institutional."

---

16. It is not necessary to this case to decide, nor does the court opine regarding, the accuracy of Buscarino's belief concerning the Michigan Landlord–Tenant Act.

17. The canons of statutory construction apply when interpreting regulations as well. *Diaz v. United States,* 648 F.Supp. 638, 644 (E.D.Cal. 1986).

Commerce is defined as: (1) social intercourse; (2) the exchange or buying and selling of commodities esp. on a large scale. *Webster's Third New International Dictionary* (1961). "Industrial" is defined as: of or belonging to industry and industry is defined as: (1) skill; (2) diligence in employment or pursuit; (3) systematic labor esp. for the creation of value. *Id.* The court believes that to read the definition of "commercial" as encompassing storage of abandoned goods and goods retrieved from a burned building would be to give "unintended breadth to the Acts of Congress." *Kurinsky, supra.* Thus, the court finds that, as a matter of law, the instant garage was not an "institutional, commercial, or industrial structure" which could be considered a facility under 40 C.F.R. § 61.141 (1988).

The court notes that under the current regulations, the above discussion would not be necessary. Since the instant garage at one time was used by tenants in connection with this ten-unit apartment building, it would have been subject to the asbestos NESHAP some time in the past. Under the current regulations, "[a]ny structure, installation or building that was previously subject to this subpart [asbestos NESHAP] is not excluded, *regardless of its current use or function.*" Section 61.141 (1993) (emphasis supplied). However, as stipulated by all, it is not the 1993 regulations that apply to the instant case.

The court's inquiry could end here. However, even assuming, *arguendo,* that the instant garage was a commercial "facility," defendants are still entitled to summary judgment in their favor as explained below.

**18.** At oral argument, government counsel conceded that the siding was not friable prior to demolition but reiterated the argument that the siding became friable during demolition. *See, e.g., Tr.,* p. 22.

**19.** Interestingly, the government recognizes that "the facility has to be the building in its virgin state before any demolition has begun with the transite on it" (*Tr.,* p. 50), but does not apply the same reasoning in defining "friable." Employing the government's logic, by the time the asbestos was made friable, the facility (if any) was no longer a facility, and the siding was no longer a

### E. Friable asbestos

Another prerequisite to application of the asbestos NESHAP is the presence of friable asbestos.

> *Friable asbestos* material means any material containing more than 1 percent asbestos by weight that hand pressure can crumble, pulverize, or reduce to powder when dry.

40 C.F.R. § 61.141 (1988).

Even if the garage were considered to be a facility, the siding was not friable asbestos material. The government does not contest the evidence offered by defendants that the siding was not friable, i.e. that it was not capable of being crushed by hand pressure in its virgin state. Instead, the government contends that the siding was "rendered friable" through demolition and by use of the "Hydra–Unit." *Pl. Resp. Br.,* pp. 10–11.[18] The government believes that this creation of friable asbestos during the demolition of a building containing non-friable asbestos-containing material [19] subjects the operation to the provisions concerning friable asbestos. *Id.* at 12–13; *cf. United States v. Tzavah Urban Renewal Corp.,* 696 F.Supp. 1013, 1019 (D.N.J.1988) (where "virgin state" friable asbestos is *discovered,* as opposed to *created,* during demolition, asbestos NESHAP applies). The government cites no case law interpreting the regulations in the manner it suggests, nor does it cite any portion of the asbestos NESHAP which supports such an interpretation.

The court notes that the current asbestos NESHAP would support the government's argument. The current scheme includes non-friable asbestos-containing materials that have become friable or that are likely to become friable during demolition within its purview.[20]

facility component; thus, there lay only a heap of rubble, to which the asbestos NESHAP would not apply. Although the court realizes the government would believe this reading a mockery, it is merely an extension of its own hypothesis. Instead, the court believes all definitions are to be assessed before commencement of any demolition.

**20.** *Regulated asbestos-containing material* (RACM) means (a) Friable asbestos material, (b) Category I nonfriable ACM that has become friable, (c) Category II nonfriable ACM that has a high probability of becoming or has

However, as noted earlier and as conceded by the government, the current asbestos NESHAP is not the appropriate authority to be applied here. Although the current asbestos NESHAP may have been amended to fill the gap revealed by the instant facts, the government's attempt to retroactively apply the current scheme to the defendant's operation must fail.

This result is not altered by the government's citation to and reliance upon an administrative memorandum authored by Edward E. Reich, Director, Stationary Source Compliance Division, Office of Air Quality Planning and Standards, EPA. *Pl. Resp. Br.*, p. 13. The government urges the court to defer to Mr. Reich's interpretation of the regulation.

■ An interpretation of a regulation by the agency charged with enforcement is "an interpretation entitled to deference by the courts *if* it is consistent with the congressional purpose, and is a *'reasoned and supportable interpretation* of the statute'" *Flint v. California*, 594 F.Supp. 443, 448 (E.D.Cal. 1984) (emphasis supplied), or regulation. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Alternatively, some courts state that an administrative interpretation of its own regulation should be "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Midwest Suspension*, 824 F.Supp. at 727, quoting, *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). The court finds that Mr. Reich's interpretation is neither soundly reasoned nor supportable and thus, that it is "plainly erroneous" and "inconsistent with the regulation" as written in 1988.

In 1985,[21] Mr. Reich interpreted the asbestos NESHAP to apply to non-friable asbestos that becomes friable during removal or demolition even though Mr. Reich expressly recognized that:

> become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations regulated by this subpart.
> 40 C.F.R. § 61.141 (1993).

the definition [of friable asbestos] appears to exclude potentially friable material from applicability because (1) the definition specifies that the asbestos must be able to be crumbled by hand pressure, rather than solely defining friable asbestos as material containing more than 1 percent asbestos, (2) the definition includes the modifier 'when dry' but not 'when broken,'" etc. and (3) the regulations are written to prevent the escape of asbestos fibers, which would not be a problem before the material actually becomes friable.

*Exhibit A, Pl. Resp. Br.*, p. 1–2.

Mr. Reich notes that the asbestos NESHAP does not cover non-friable asbestos which becomes friable, then determines that it really should, and thus, concludes that it does. His conclusion runs counter to any recognized tenet of construction but is, rather, an admittedly result-oriented decision. Mr. Reich's decision to expand the coverage of the asbestos NESHAP to address issues unanticipated at the time of promulgation, i.e., non-friable asbestos which becomes friable or has the potential to become friable, is, in kindest terms, creative. Less charitably, it could be an example of bureaucratic arrogance.

As noted earlier, the regulations were eventually changed in 1990 to include nonfriable asbestos-containing material which is potentially friable (or which becomes friable) within the scope of the asbestos NESHAP's requirements. 40 C.F.R. § 61.141 (1993). The government contends that the 1990 regulations were amended simply to "clarify" the earlier regulations. As stated by government counsel during oral argument:

> EPA believes that, it's clear in the preamble, that that change in the regulations was a clarification of the regulation. That was the interpretation that was always applied. EPA's definition of friable is not changed, it's just that basically that new regulation is a—in the regulation, it takes the policy

21. The asbestos NESHAP was significantly amended in 1984, and then again in 1990. Thus, Reich's interpretation in 1985 would be relevant to the asbestos NESHAP as written between 1985–1989. As noted earlier, the applicable regulations in the instant case are those as written in 1988.

and these interpretations and it makes them part of the regulation.

*Tr.,* p. 26.

Thus, the government concludes that Mr. Reich's interpretation of the 1988 regulations as being the equivalent of the 1993 regulations is reasonable. By "tak[ing] the policy and these interpretations and [ ] mak[ing] them part of the regulation," the government concedes that the regulations were changed to conform to internal policy.[22] The government then seeks to retroactively apply these changes to the instant defendants under the guise of "clarification" of pre-existing rules. However, the amendments were not minor clarifications; they were broad and sweeping changes made to the very structure of the regulations themselves.

To interpret the previous regulations in a manner consistent with Mr. Reich's opinion prior to such a regulatory change would be to permit creation of whole categories of rules known only to those on the EPA mailing list and permit them to be applied to unsuspecting citizens. This would stand as anathema to the requirement that administrative rules be properly promulgated so that notice of the rules is given prior to meting out punishment for their transgression. *Ford Motor Co. v. United States EPA,* 567 F.2d 661, 671–672 (6th Cir.1977) ("Ad hoc national policy determinations developed through internal agency memoranda standing alone without promulgating regulations or guidelines through public notice and/or an opportunity for a public hearing, are not proper procedures for EPA to enforce the FWPCA."); *Huron v. Richards,* 997 F.2d 1168, 1176 (6th Cir.1993) (finding that where an agency [FAA] "attempted to fix rights of members of the general public ... [s]uch actions are rulemaking, subject to the APA's notice and com-

ment requirements" because they are " 'legislative' rather than 'interpretive.' ").

It cannot be said that Mr. Reich's memorandum falls into the category of " 'interpretive' rules—'those which merely clarify or explain existing law or regulations'—[which] are exempt from the[ ] requirements [of notice and opportunity for comment under the APA]." *Cal–Almond, Inc. v. U.S. Dept. of Agriculture,* 14 F.3d 429, 447–48 (9th Cir. 1993); *Village of Kiryas Joel Local Dev. Corp. v. Insurance Co. of N. Am.,* 996 F.2d 1390, 1394 (2d Cir.1993) (noting that "Circular letters" sent by the Superintendent of Insurance which impose "extra-statutory obligations" will not be enforced). The rationale behind this rule is that in interpreting rules, the agency acts in its quasi-judicial role, not in its quasi-legislative, rule-making role. *Mason General Hospital v. Secretary of Dept. of Health and Human Services,* 809 F.2d 1220, 1224 (6th Cir.1987).

> A basic distinction must be recognized between (1) new applications of law, clarifications, and additions, and (2) substitution of new law for old law that was reasonably clear. The first is natural, normal, and necessary. The second raises problems of fairness to those who have relied on the old law.

K.C. Davis, *Administrative Law Treatise,* § 20:7, p. 23 (1983), *quoted in Mason General Hospital,* 809 F.2d at 1225. In the instant case, application of the more modern regulations directly or circuitously, simply by interpreting the older regulations and *declaring* them now to be entirely synchronous with the newer ones, would raise the latter "problems of fairness." The court would not wish to hasten the day that such retroactive embellishment would be considered "natural, normal, and necessary."[23]

---

**22.** At oral argument, the court noted that the new NESHAP specifically includes potentially friable material which did not exist under the old [NESHAP] and further noted that "[t]he old regulation didn't say that but the Reich interpretation of the old regulation did say that." The government's response to this was, "[t]hat's right." *Tr.,* p. 25.

**23.** The government's citation to *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) does not

alter this conclusion. Although the government states that the case "says [Mr. Reich's interpretation is] a reasonable interpretation because if you make or create asbestos from nonfriable forms it's friable." *Tr.,* p. 22. Although *Chevron* is the seminal case regarding the deference given agency interpretations, its holding defined "stationary source" under the Clean Air Act's provisions for pollution emissions from industrial plants. The holding has nothing to do with the asbestos NESHAP let alone the specific issue of whether the asbestos NESHAP applies to situations in

The result cannot be altered by the impassioned[24] argument posited by government counsel regarding the dangers of asbestos-containing products which are, in their virgin state non-friable, but which become friable during demolition. *See, e.g., Tr.*, pp. 27, 81–84. The court does not doubt the sincerity or depth of government counsel's concern; similar concern inspired the regulations to be amended to protect from the perceived danger posed within this very situation. However, our limited question here is not which regulation states a "better" policy for the environment; courts are not ordained to impose policy preference choices on society. *Chevron*, 467 U.S. at 865, 104 S.Ct. at 2793 (noting that courts may not make decisions "on the basis of the judges' personal policy preferences."). The court is required only to apply the regulations which were in place at the time the instant defendants demolished the instant garage.

Nor is the result altered by reference to *Hugo Key*, 731 F.Supp. 1135. The government contends that this case supports its position that the asbestos NESHAP applies to nonfriable asbestos that becomes friable during demolition. *Tr.*, p. 32. The government argues that in *Hugo Key* the court applied wetting requirements to the removal of a "water heater" which, once "dragg[ed] across the ground," loosened the asbestos coating, making it friable. *Tr.*, p. 32. However, the government neglects to mention that the asbestos coating on the water heater in *Hugo Key* was friable before it was ever moved. *Hugo Key*, 731 F.Supp. at 1143 ("It is undisputed that the boilers were covered with friable asbestos materials."). *Hugo Key* does not address the issue at hand and the government's citation to it for this principle is misleading and inappropriate.

### F. Visible emissions

■ Even assuming, *arguendo*, that the instant garage is a "facility," that Count III is not precluded by § 61.145(c), and the presence of friable asbestos, there is insufficient proof of an emissions violation.

which nonfriable asbestos becomes friable during demolition.

**24.** *See, e.g.,* counsel's comments during oral argument wherein he refers to asbestos as "poi-

The standards for controlling asbestos emissions are expressed in the form of work practice requirements. The asbestos NESHAP requires each owner or operator of a demolition operation to comply with the work practices set forth in 40 C.F.R. § 61.147, where the amount of friable asbestos materials in the facility being demolished is at least 260 linear feet on pipes or at least 160 square feet on other facility components. 40 C.F.R. § 61.145(a).

*Hugo Key*, 731 F.Supp. at 1141.

Visible emissions means any emissions containing particulate asbestos material that are visually detectable without the aid of instruments. This does not include condensed uncombined water vapor.

40 C.F.R. § 61.141 (1988).

Count III of the complaint alleges that defendants wrongfully discharged visible asbestos emissions in violation of 40 C.F.R. § 61.152(b). That section provides:

Each owner or operator of any source covered under the provisions of §§ 61.144, 61.147, 61.148 and 61.149 shall:

(b) Discharge no visible emissions to the outside air during the collection, processing (including incineration), packaging, transporting, or deposition of any asbestos-containing waste material generated by the source, or use one of the disposal methods specified in paragraphs (b)(1), (2), or (3) of this section ...

40 C.F.R. § 61.152(b).

In support of its motion for summary judgment, the government offers evidence that the MDNR inspectors and Mr. Anderson, observed numerous pieces of pulverized transite scattered over the demolition site, [and of] Mr. Harris's observation of "the wind causing the discharge of visible emissions." *Pl. Br. in Support*, p. 26. The government also offers Mr. Reed's observation of "visible emissions of dust from areas contaminated with the broken, crumbled, pulverized or crushed transite material [ ] caused by the action of the wind, vehicles and the Hydra-

son" and asserts that people outside the E.P.A. "just don't understand." *Tr.*, p. 13, 83.

Unit." *Pl. Br. in Support,* pp. 26–27. However, the government does not offer any evidence by which to judge whether these visible particles were ordinary dust or dust which contained asbestos. The evidence is thus insufficient.

At oral argument, the government appeared to concur with Judge Zatkoff's initial thoughts on this issue:

> Here the government's various affidavits state that 'dust' was observed. This is insufficient under the 'no visible emission' standard. Accordingly, the government must prove that it visually observed asbestos material in the stream of emission without the aid of instruments.

*United States v. Midwest Suspension and Brake,* 803 F.Supp. at 1267, 1271 (E.D.Mich. 1992) (internal citations omitted) (denying summary judgment for the government). Government counsel responded to the court's query as to whether the emissions must be visibly detectable or whether the particulate asbestos material must be visibly detectable by saying, "[t]he particulate asbestos material." *Tr.,* p. 54. However, government counsel then informed the court, via letter, of his desire to withdraw his response because he:

> should have responded that the emissions that must be visibly detectable were the emissions of dust from the pulverized transite, which sampling had shown contained asbestos. Because asbestos particles cannot be detected without the aid of an instrument (such as a microscope), 'particulate asbestos materials' cannot be visually detectable.

*Pl. Letter,* dated October 20, 1994, received October 21, 1994.

Defendants strongly object to the government's attempt to amend statements made at oral argument, noting that "statements made by a party or his counsel are binding." *Def. Letter,* dated October 21, 1994, received October 24, 1994. It is true that lawyers' statements bind their clients. *United States v. Johnson,* 752 F.2d 206, 210 (6th Cir.1985)

("Statements of an attorney that are directly related to the litigation at hand have been held to be within the attorney's scope of authority and binding on the client."); *American Title Insurance Co. v. Lacelaw Corporation,* 861 F.2d 224, 226 (9th Cir.1988).[25] However, this rule is generally applied to bind clients by *factual* statements made by counsel, not counsel's interpretation of the law. *American Title,* 861 F.2d at 226 ("statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court."). Since the court is charged with interpreting the law, neither government counsel's statement nor his retraction are conclusive.

The court notes that the government's second iteration of the law is consistent with Judge Zatkoff's reconsidered perspective on the issue:

> [T]he government does not have to prove that the asbestos fibers themselves are visually detectable without the aid of instruments. All the government must prove, by a preponderance of the evidence, is that an emission, which was detectable without the aid of instruments, occurred and that the emission contained asbestos.

*United States v. Midwest Suspension and Brake,* 824 F.Supp. 713, 727–28 (E.D.Mich. 1993).[26] In the second *Midwest,* the court held that the government had proven, by a preponderance of the evidence, that asbestos emissions had occurred where: (1) an emission, which came to rest on a box, was sampled and found to contain asbestos;[27] (2) samples of material in a "designated dumpster" contained asbestos;[28] and (3) a sample of discarded material did not contain asbestos but 72% of the brake shoes to be delined contained asbestos and prior sampling that day in the same "designated dumpster" had revealed the presence of asbestos.[29]

Even under the legal standard set forth in the second *Midwest,* the instant evidence is insufficient. The court will assume that

---

**25.** The court considers also that it is a rare situation indeed where an attorney would walk away from an oral argument *not* regretting a statement uttered or omitted.

**26.** Applying the 1987 asbestos NESHAP.

**27.** October 13, 1989.

**28.** June 12, 1987.

**29.** June 12, 1987.

emissions, rather than particulate asbestos, must be visible. Even under that assumption, however, proof that the emissions contained some asbestos (microscopic or otherwise) is required. There is no evidence that asbestos was present (whether visible to the unaided eye or not) in the instant emissions. The government's reference to "samples" is misleading. The government has presented evidence that the *siding* was sampled and "reported to be between 10 to 20 percent asbestos" and more than 1% asbestos by weight." *JFPTO*, p. 13. However, the government did not sample the *emissions* on site; thus, there is no evidence that any on-site emissions contained asbestos. Although the presence of asbestos in emissions from demolition operations involving asbestos-containing materials may be implied under the current regulations,[30] such an implication is insufficient under the earlier regulations which apply to this case.

The court notes that the second and third grounds for liability in the second *Midwest* could be read to allow implication of the presence of asbestos emissions in demolitions involving asbestos-containing material. To the extent that the second *Midwest* can be read to allow such implication under the 1987 regulations, this court departs from it.

Therefore, even assuming the instant garage is a "facility," that Count III is not precluded by § 61.145(c), and the presence of friable asbestos, there is insufficient proof of an emissions violation.

### IV. Conclusion

For the reasons stated above, the court finds: (1) the threshold minimum amount of friable asbestos necessary under Count II has not been shown (§ 61.145(a) and (c)), and Count III is inappropriate because the demolition was ordered (§ 61.145(c)); (2) the as-

bestos NESHAP does not apply because the subject garage was not a facility as defined in the asbestos NESHAP; (3) assuming the garage was a facility, the subject siding did not contain friable asbestos and the regulations in 1988 applied only to friable asbestos, not asbestos-containing materials which may become friable during demolition; (4) there was no evidence that any visible emissions actually contained asbestos, and the presence of asbestos can not be implied under the applicable regulations simply because the demolition involved asbestos-containing materials.

Accordingly, plaintiff's motion for summary judgment is DENIED and defendant Owens' motion for summary judgment is GRANTED. Thus, the case is DISMISSED in its entirety.[31]

IT IS SO ORDERED.

---

**30.** *Visible emissions* means any emissions which are visually detectable without the aid of instruments, coming from RACM or asbestos-containing waste material, or from any asbestos milling, manufacturing, or fabricating operation. This does not include condensed, uncombined water vapor. 40 C.F.R. § 61.141 (1993), *see also,* § 61.145(c)(1) (1993) (requiring preventive measures, such as wetting and wrapping, of nonfriable regulated asbestos containing materials unless they are Category II nonfriable asbestos con-

taining material and "the probability is low that they will become crumbled, pulverized, or reduced to powder [i.e. friable] during demolition.").

**31.** The parties stipulated, at oral argument, that if the court were to find that the asbestos NESHAP was not violated here, the plaintiff's claim against Buscarino would also fail, and defendant Owens' cross-claim against Buscarino would be rendered moot. *Tr.,* p. 92.