**UNITED STATES of America, Plaintiff,**

**v.**

**James WALSH, Defendant.**

**No. C89–1263Z.**

United States District Court,
W.D. Washington,
at Seattle.

Nov. 27, 1991.

Susan L. Barnes, U.S. Atty.'s Office, Margaret Bernice Silver, U.S. E.P.A., Seattle, Wash., Richard M. Gladstein, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Enforcement Section, Washington, D.C., for U.S.

Rhys Alden Sterling, Halinen & Vander Wel, Bellevue, Wash., for James Walsh.

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZILLY, District Judge.*

Let me start by thanking the lawyers for the excellent briefs that have been presented prior to trial and the thoughtful proposed Findings of Fact which were presented by both sides, as well as the presentation during the course of the trial. The Court has benefited from both the written materials that have been submitted as well as what has been presented here during the course of the trial.

I must say at the beginning that I have been concerned about the nature of the case in the sense that the government has brought its full force, three lawyers participating in the trial, we're in our fifth day of trial, originally seeking over $825,000 from a defendant who has essentially no assets. And I have to tell you that I've been concerned as we've gone through this trial with the appropriateness of proceeding under all of those circumstances against this particular defendant.

I do recognize, as I think all the participants and the people who have observed the case recognize, there are important issues of law, important principles that need to be established. And this Court is here to hear those issues in the appropriate case and to decide those issues, and I intend to do so.

This memorandum opinion that I am rendering will be intended to be my opinion. My Findings of Fact and Conclusions of Law pursuant to Rule 52 will be incorporated into my opinion today. I will not be issuing separate or additional Findings of Fact or Conclusions of Law.

This matter comes before the Court after trial. The EPA seeks civil penalties and injunctive relief against the defendant, Mr. James A. Walsh, for violation of the Clean Air Act and its regulations arising from work performed by Savage Enterprises on four jobs during the period 1986 and 1987.

Savage Enterprises, Inc., a Washington corporation, as well as Mr. James Savage have both settled with the EPA and the lone remaining defendant in this case is Mr. Walsh.

I incorporate by reference all of the admitted facts contained in the Pretrial Order and they will be facts found for purposes of my opinion.

The real question presented here is whether Mr. Walsh's activities make him liable for the alleged violations and, of course, were there sufficient violations to subject Mr. Walsh to liability. The regulations impose liability on an owner or operator. These regulations define owner or operator as, "any person who owns, leases, operates, controls or supervises a stationary source," 40 CFR 61.02. Each of the four locations in question, in my opinion, constituted a stationary source.

I have already ruled that even if Mr. Walsh were not an owner, and nobody contends that he was an owner, he could be responsible if he was an operator if he supervised or controlled the work. I also stated in May of this year as a result of motions for summary judgment that because the statute and the regulations in question impose strict liability, the Court would be reluctant to impose liability unless it was clear that Mr. Walsh was substantially in control or substantially supervised the various projects in question.

I recognize the government contends that there is nothing that has to be substantial about that supervision, but I believe that what was intended here was a person having significant or substantial or real control and supervision over a project before he or she could be found liable under these regulations if they were not an owner. And it is my intention to apply that test in determining the liability of this defendant.

Of all Mr. Walsh's job titles, he was vice-president for a period of time, he was president beginning, I believe, in about March of 1987 through about November of 1987, although those titles and his signing of various documents is some indication of his

* Editor's Note: The Court delivered the following as an Opinion from the Bench. Minor changes have been made for purpose of publication.

responsibilities and authority, I believe a job by job analysis is necessary before a decision can be reached.

I must say before reviewing those four jobs in question that I found on the whole Mr. Walsh's testimony to be very credible. I also found in contrast Mr. Savage's testimony to be not credible. It differed substantially from his prior deposition testimony. And its lack of specificity brings this Court to conclude that little, if any, reliance can be placed on Mr. Savage's testimony during the course of the trial.

I also would like to note the problem in dealing with a small business of ten to 15 people. Savage Enterprises had approximately ten to 15 employees. That included the owner, Mr. Savage, and the other people who served in some management capacity. These small companies don't organize like large companies, and the lines of authority and who is responsible and who is not responsible is much more difficult in a small operation.

I would also point out, of course, on the other hand, the EPA is seeking to impose penalties, and each employee seeks to point to the other employee and say they're responsible. It's kind of like a shell game. The peanut is under one of the shells and everybody is pointing at the other shell and saying they are not responsible.

■ Mr. Savage was the owner of the business and obviously was responsible. The question is whether Mr. Walsh is also responsible. Mr. Walsh was an estimator during his employment period with the company. Between May of '86 and February of '87, he served as vice-president, and from March of '87 to November of '87, he served as president. Mr. Savage always continued to be the ultimate person in control as evidenced by the fact that he fired Mr. Walsh at one point in the summer of 1988 and Mr. Walsh terminated his employment with the company. As is the case with many small companies, the title given to the person is not necessarily indicative of a person's authority or lack of authority.

Let's turn now to the four projects in question. The first project I want to discuss is the Sea-Tac project. It involved work at the Port of Seattle during the period approximately January 4, 1986, through April 15, 1986. Both Mr. Savage and Mr. Walsh estimated the job. Mr. Walsh wrote the letter proposal of January 4, 1986, which is exhibit 6, to the Elan Construction Company, the general contractor for renovation work at Sea-Tac.

Mr. Walsh's letter indicated that dry removal may be used around the perimeter walls of the work. There is a dispute as to how much of the perimeter would be subject or possibly subject to dry removal. Mr. Walsh has testified that he intended it to be 12 inches, but then he also intended not to use dry removal. I would point out that the letter also states that the work would be done in strict compliance with all governmental rules and regulations. Mr. Walsh also signed the Notice of Intent to Remove, exhibit 4, and the Amended Notice, exhibit 5.

Between January 20 and April 15th, the Savage Enterprise employees conducted removal of asbestos from the Sea-Tac Airport project. During the project, Kent Slater, the foreman, testified he discussed the work with Mr. Walsh, took directions from him and Mr. Walsh directed dry removal of asbestos around the perimeter of the work area. I find that testimony to be credible and make that finding. Mr. Slater also testified and I find that dry, friable material capable of crumbling with hand pressure was removed from the Sea-Tac project.

Mrs. Nolan of the Puget Sound air control authority, whose testimony I also found to be very credible, met with Mr. Walsh at the site about February 4, 1986, and discussed various problems. Mr. Walsh suggested various solutions and alternatives. Mrs. Nolan went back on February 11th and prepared an inspection report, exhibit 72, which outlines the violations including the removal of dry, friable asbestos, asbestos not adequately wetted and a large pile of asbestos inside the containment area.

Three notices of violation were issued on February 11th, exhibits 65, 66 and 67, and they were sent to Jim Savage as the person

responsible, the owner or the agent of the owner. Samples were taken and tested positive for asbestos as contained in exhibit 64. Subsequent notices and orders of civil penalties were sent to the Savage company, exhibits 68 and 69. Mr. Walsh signed the Notice of Appeal, exhibit 7, appealing these notices. A portion of the penalty was later affirmed, I believe in the amount of $500.

Ms. Carolyn Rankin, a Port inspector, also inspected the project, dealt with Mr. Walsh and testified that friable material was present at the jobsite in violation of the various regulations. Mr. Walsh was the primary contact with Ms. Rankin on several occasions. I found her testimony to be very credible and supported by her inspection reports as well as her diary notations.

I find and conclude under all the facts that were presented in connection with this particular project that Mr. Walsh, although he only had the title of estimator at the time, was, in fact, the Savage Enterprises employee responsible for the overall supervision and control of that project. He had the ability to correct work, he was the person having the necessary control to be an operator under the statute. I also find there were serious violations of work practices under 40 CFR 147 which will support liability against Mr. Walsh arising from the Sea–Tac project.

■ The next project I want to discuss is the Woodinville School project. Between June 26th and July 3 of 1986, Savage Enterprises conducted removal of asbestos at the Woodinville School located at 13209 Northeast 175th Street in Woodinville, Washington. During this period, Mr. Walsh was the vice-president and he signed the contract for Savage Enterprises. Esther Miller was, however, the estimator and responsible for solving problems during the course of the work. Mr. Joe Silva was the foreman of the project.

Mr. Walsh was not present at the work and I find did not have sufficient control over this project to be an operator of the project. Although serious violations were found to exist, he cannot be held personally responsible because of his lack of hands-on supervision and control of that project. The fact that Mr. Walsh may have signed a Notice of Appeal and a Notice of Violation is, in my opinion, not sufficient to bring into account civil liability against the defendant for this project.

■ The third project that I want to discuss is the Crab Pot Restaurant. Between July 17 and September of 1986, Savage Enterprises conducted removal of asbestos at the Crab Pot Restaurant facility at Pier 52 in Seattle. During this project, Mr. Walsh was vice-president of Savage Enterprises and responsible for the overall supervision of the project, including all contractual aspects. He signed the Notice of Intent to Remove, exhibit 10.

Mr. Van Pham visited the worksite before work commenced and talked to Mr. Walsh about the scope of the project. Van Pham was the foreman during the first week and he took directions from Mr. Walsh. Mr. Walsh testified and I find that there were, in fact, two shifts that were working on this project, a day shift and a night shift, and two separate foremen. If there were problems or calls by the workers or the other inspectors, Mr. Walsh admits he would have dealt with them.

Mr. Walsh testified previously on July 22nd of 1987 before the Department of Labor and Industries in a hearing, his testimony is reflected in exhibit 186, that he was responsible for this project. Mrs. Nolan inspected the project in July, exhibit 103, and September 8th, 11th and 22nd, exhibit 104, and found asbestos material in a crawl space as well as chunks of asbestos in the floor where the work had been done. Samples were taken which revealed asbestos as shown by exhibits 106, 107 and 108.

Judy Tallman, I believe her name was Judy Stevens at the time, was the inspector for the Port of Seattle during this project and believed Mr. Walsh was the project superintendent. Mrs. Tallman dealt with the defendant regarding scheduling, delays and increased costs in the project. She talked to the defendant two to three times a week during the entire course of the project.

Mr. McClelland Davis of the Department of Labor and Industries inspected the Crab Pot in July and August, see exhibit 109, and found asbestos outside the containment area, found workers without proper equipment and testified and I find the asbestos was friable.

Mr. Savage testified during his deposition, page 131, line 14, that Mr. Walsh was the superintendent and had an on-site supervisory role for the Crab Pot Restaurant. I find and conclude that Mr. Walsh did have, in fact, overall supervision of this project and/or held himself out to others as being a person in charge. I find violations of the work practices and find that Mr. Walsh is responsible for them. I also find that the violations here were not as significant as they were at the Sea–Tac project.

▮ The fourth and last project is 1104 Northeast 47th Street here in Seattle. Actually, this project involved removal of asbestos from two buildings owned by the Coppage family located at the corner of 11th Avenue and 47th Northeast in Seattle. The larger of the two buildings was a two-story building commonly referred to as the 1104 Building.

Although Mr. Walsh was the president of the company at that time, he had no real personal involvement in this particular project. He signed the Notice of Removal for the small cottage which adjoined the 1104 Building, the small cottage's notice was, I believe, exhibit 118, but did not estimate the 1104 project. That was done by Mr. Pullen, I believe. But in any event, it wasn't done by this defendant. And there was no notice sent by anyone as required by law as to this project.

I find and conclude based on the evidence that Mr. Walsh was not an operator as it relates to the 1104 Building site for purposes of this case. I make that conclusion because he didn't estimate the job, he was never on the jobsite while the work was being performed. He never actually saw the building and testified that he never did know what it looked like until he saw pictures during the course of the trial. And there may have been other people that would be responsible and could be brought to account, but I don't believe Mr. Walsh is one of them. The fact that he was president in name does not, in my opinion, suffice. And his personal involvement, as I've indicated, is not sufficient, I believe, to find liability.

▮ I believe and find that it is not necessary to find specific air emissions in order to have a violation under the Clean Air Act. But I also find in the alternative that evidence was presented that under specific conditions observed and documented at both the Sea–Tac and the Crab Pot projects, the government has proved by a preponderance of evidence that the defendant caused asbestos materials to be emitted to the outside air during removal or after removal in violation of 42 U.S.C. Section 7412.

The next subject that needs to be dealt with is Mr. Walsh's financial condition and what is an appropriate civil penalty. I have a lot of concern here because of the nature of the defendant's financial condition at the present time. It is true that while he worked at Savage Enterprises, as shown by various exhibits and his own testimony, he made during the first year approximately 26 to $28,000, during the second year $35,000, during the third year, I believe the total was 110,000 as shown by his income tax returns, although 50,000 of that was a loan and then later converted into compensation at the direction of Mr. Savage, and during the fourth year, 18 to $20,000.

Unfortunately, Mr. Walsh has fallen on somewhat hard times. During 1990, he had attributable income to him of $8900, most of which was attributable income other than real income paid to him for his work. I think the level of his income, actual earnings themselves, was something in the 2 to $3,000 range. Maybe it was as much as 4,000. It wasn't enough to live on. And clearly, he's not been able to live on what he's made and as a result has lived with his girlfriend, apparently, who pays the rent and buys the food. Sounds like a pretty good deal for Mr. Walsh, but it obviously indicates that he is not able to

pay any significant fine or civil penalty as well.

The expert that the government presented, an EPA expert economist, frankly admitted under questions from the Court that given his level of actual income or even attributable income during 1990 and 1991, the defendant cannot pay any significant fine or civil penalty.

Based on the facts that I've found, I make the following Conclusions of Law.

One. The Court has jurisdiction over the subject matter pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. Section 7413(b). Also, venue is proper in this district pursuant to 42 U.S.C. Section 7413(b).

Two. Section 112 of the Clean Air Act, 42 U.S.C. Section 7412, authorizes the administrator of the Environmental Protection Agency to publish a list of hazardous air pollutants and to establish a national emission standard for hazardous air pollutants, frequently known as NESHAP, to provide an ample margin of safety to protect the public health from such hazardous air pollutants. 42 U.S.C. Section 7412(b)(1)(B).

■ A hazardous air pollutant is an air pollutant which, in the judgment of the administrator, causes or contributes to air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious, irreversible or incapacitating irreversible illness. 42 U.S.C. Section 7412(a)(1).

Asbestos is listed as a hazardous air pollutant. 36 Federal Register 3031.

It is not feasible to prescribe or enforce an emission standard for control of a particular hazardous pollutant. The administrator of the EPA may instead promulgate a design, equipment or work practice, operational standard or combination thereof.

The asbestos NESHAP establishes work practices to be followed in the handling of asbestos and any work practice standard promulgated as a part of NESHAP should be treated as an emissions standard. A violation of NESHAP is a violation of the Clean Air Act. 42 U.S.C. §§ 7413(b), 7412.

■ A person is liable for civil penalties under the act if the United States can demonstrate that minimum threshold requirements of the asbestos NESHAP have been met and that the work practices of the asbestos NESHAP have not been satisfied. As I've indicated, a person violates those practices when a person is the owner or operator of a renovation or demolition operation, a threshold amount of friable asbestos was involved and the person violated the guidelines.

■ The asbestos NESHAP applies to each owner or operator of a demolition or renovation operation if the amount of friable material reaches a certain amount. I find that the amount of friable material reached the required amount, and I find that Mr. Walsh is an operator under the meaning of the Clean Air Act and its regulations. Visible emissions to the outside air from a facility need not be shown for an owner or operator to violate the asbestos work practices NESHAP.

■ As I've indicated, an owner or operator who violates asbestos work practices is liable for civil penalties up to $25,-000. I have previously found as a fact and I find as a conclusion of law as well that Mr. Walsh was an owner/operator under the Clean Air Act and its applicable regulations, has violated the asbestos NESHAP work practices, regulations.

In determining the amount of penalty, I must consider the nature of the violations, the size of the business that was in existence at the time and the present business, the ability to pay. And the amount of penalty is always at the discretion of the Court. The Court must take into account the good or bad faith of the defendant and the need to deter others.

I wish to state on the record that I do take into account what I felt to be very credible and responsive testimony while Mr. Walsh testified. And he did acknowledge, I'm satisfied, the seriousness of the charges and the need to abide by all of these regulations which he's been called upon to answer to. I also find that during

his course of work at Savage, he took efforts to train himself and to train others and to prepare work manuals that dealt with the problems dealing with asbestos.

I am also taking into account the nature of the fact that there is no reported opinion that anyone can point to that has held a nonowner responsible for civil penalties.

In the Court's judgment, taking all of this into account, the EPA should be awarded a civil penalty against Mr. Walsh as follows. In connection with the Sea–Tac project, a civil penalty in the amount of $2500. And with respect to the Crab Pot project, a civil penalty in the amount of $1,000. The penalties must be paid within two years of the date of judgment, with interest accruing at the federal rate of interest.

I am also going to award and grant injunctive relief against Mr. Walsh personally. I believe it is appropriate that injunctive relief be granted in a case like this given the nature of the violations that have occurred. Mr. Walsh will be enjoined from engaging in any removal of asbestos without full and complete compliance with the Clean Air Act and the asbestos NESH-AP work practices. The period of the injunctive relief should be for a period likewise of two years.

I would point out that in assessing a penalty, as I have said, I have taken into account a lot of factors. I suppose primarily I'm taking into account that the owner of this business is not here for me to assess penalties against, and Mr. Walsh has little ability to pay a penalty. I am hopeful that the Court's decision and the findings of the Court will be a substantial deterrent to others. I am confident that it is going to be a deterrent to Mr. Walsh as he continues to work in this industry.

I think that assessing a greater penalty would not be productive, would not be collectable and would serve no reasonable or just purpose. I believe that the penalties in the amounts that I've indicated are something that, hopefully, Mr. Walsh will be able to pay in the period I've indicated and get on with his life.

I believe that concludes my findings and conclusions.