**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James WALSH, as individual and
as officer of Savage Enterprise,
Inc., Defendant–Appellant.**

**No. 92–35088.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 3, 1993.

Decided Oct. 26, 1993.

Rhys A. Sterling, Hobart, WA, for defendant-appellant.

Andrew C. Mergen, Dept. of Justice, Environmental and Natural Resources Div., Washington DC, for plaintiff-appellee.

Before: WALLACE, WRIGHT and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

James A. Walsh appeals the judgment of the district court, 783 F.Supp. 546, entered against him for violation of section 112 of the Clean Air Act (the Act), 42 U.S.C. § 7412 (prior to its November 15, 1990 amendment), and the National Emission Standards for Hazardous Air Pollutants for asbestos, 40 C.F.R. § 61, Subpart M (NESHAP) (prior to their November 20, 1990 amendment). There is little published appellate authority on the contentions raised in this appeal, and this case presents an opportunity to furnish more. We affirm the judgment.

## STATUTE

The Act, 42 U.S.C. § 7412, authorizes the Administrator of the Environmental Protection Agency (EPA) to publish a list of air pollutants EPA determines to be hazardous and to describe the emission standards known as NESHAP for those pollutants. Asbestos was listed as a hazardous air pollutant and a NESHAP relating to asbestos was promulgated. See 140 C.F.R. § 61, Subpart M, providing for the procedures to be followed in the removal and disposal of materials containing asbestos.

The Act provides that "any design equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as an emission standard for purposes of the provisions of this chapter." 42 U.S.C. 7412(e)(5). The asbestos NESHAP requires the owner or operator of a renovation or demolition operation where there is at least 260 linear feet of friable asbestos materials on pipes or at least 160 square feet of asbestos on other components of the facility, to notify the EPA; to comply with certain procedures to prevent emission of particulate asbestos to the outside air; to adequately wet friable asbestos materials when they are being stripped; and to insure that the materials remain wet until they are collected for disposal. 40 C.F.R. § 61.145, .146 and .147.

## PROCEEDINGS

On August 22, 1989 the United States filed a complaint against Savage Enterprises, Inc., against James Savage, and against Walsh, seeking civil penalties and injunctive relief under the Act, 42 U.S.C. § 7413, for seven violations of NESHAP, promulgated under section 112 of the Act, 42 U.S.C. § 7412. On September 13, 1991 the district court entered a consent decree resolving all claims against Savage Enterprises and James Savage. Walsh went to trial on November 14, 1991. Three charges were dropped prior to trial, and on two, after a five-day bench trial, the court entered judgment for Walsh.

The two charges as to which Walsh was found liable are as follows: (1) Between January 20, 1986 and April 15, 1986 he engaged in removal of friable asbestos at the Seattle–Tacoma Airport (Sea–Tac), Northwest Airlines offices, conducting a dry removal of asbestos without following the procedures prescribed for obtaining a waiver of the wetting requirement in violation of 40 C.F.R. § 61.147(c), and in violation of the same regulation he failed to insure that friable asbestos materials at this site remained wet until collected for disposal. (2) As the operator of an asbestos removal at the Crab Pot restaurant, Pier 52, Seattle, between July 17, 1986

and September 22, 1986, Walsh failed to insure that friable asbestos materials remained wet until collected for disposal in violation of 40 C.F.R. § 61.147(e).

The court imposed a penalty of $3,500 and enjoined him from performing further asbestos-removal projects for a two-year period without complying with the Act and without notifying the EPA.

Walsh appealed, raising a variety of issues.

## ANALYSIS

### 1. Statute of Limitations

■ Walsh contends that the action of the United States is an action for money damages brought by the United States and founded on a tort, so that the three-year tort statute of limitations applies, 28 U.S.C. § 2415(b). Walsh is in error. The government's action does not sound in tort but is for the enforcement of a civil penalty. The appropriate statute is the five-year statute of limitations. 28 U.S.C. § 2462.

### 2. Selective Prosecution

■ Walsh contends that he was singled out personally because Savage Enterprises entered bankruptcy without paying any civil penalties and his prosecution was the only way the government could "get even" with Savage Enterprises. Walsh's contention is unpersuasive. Savage Enterprises and its owner, James Savage, were the subject of the government complaint. At trial on the witness stand Walsh conceded that he had no sense that he was being targeted. The contention of selective prosecution is without merit.

### 3. Walsh's Liability As An Operator

■ Walsh, who admittedly was not the owner of Savage Enterprises, contends that he was not an operator within the meaning of the Act. He points to the preamble to the asbestos section of NESHAP, 49 Fed.Reg. 13657, 13659 (April 5, 1984), stating that only the renovation contractor on a project is intended to be held liable. The relevant regulations nonetheless define as liable "any person who owns, leases, operates, controls, or supervises a stationary source." 40 C.F.R. § 61.02. The district court interpreted the regulation to apply only to "a person having significant or substantial or real control and supervision over a project." Applying that definition, the district court found Walsh not to be liable as to two of the projects as to which the government had charged him. In making this determination, the district court found Walsh's testimony as to all four projects "to be very credible," whereas it found "in contrast Mr. Savage's testimony to be not credible."

The district court noted that Savage Enterprises had approximately 10 to 15 employees including its owner, James Savage, as well as other people serving in some management capacity. In the period of the charged violations, Walsh first served as an estimator for the company, then as vice president of Savage Enterprises, and from March of 1987 to November 1987 as the company's president. The district court found that throughout this period James Savage himself was "the ultimate person in control" and that the title given to Walsh was "not necessarily indicative" of his authority.

On the Sea–Tac project from January 4, 1986 through April 15, 1986, Walsh had the title of estimator. He wrote the asbestos removal proposal to the general contractor for renovation work at Sea–Tac. He also signed the Notice of Intent to Remove Asbestos and the Amended Notice. He met with a representative of the Puget Sound Air Control Pollution Authority on two occasions on which asbestos removal problems were discussed. He also dealt with an inspector for the Port of Seattle in relation to asbestos problems. On the basis of the testimony the district court concluded that Walsh "had the ability to correct the work, he was the person having the necessary control to be an operator under the statute."

At the Crab Pot Restaurant Project at Pier 52 in Seattle, between July 17, 1986 and September 1986, Walsh was vice president of Savage Enterprises and responsible for the overall supervision of the project. He signed the Notice of Intent to Remove Asbestos. The foreman of the project, Van Pham, took directions from Walsh. If there were prob-

lems of calls by workers or inspectors, Walsh admits that he would have dealt with them. Walsh also testified in a hearing before the Department of Labor and Industries of the State of Washington that he was responsible for the project. An inspector for the Port of Seattle dealt with Walsh and believed that he was the project superintendent. The court concluded that Walsh held himself out as being in charge and was in fact in charge.

Evidence of Walsh's responsibility as to the two locations where he was not held liable stands in contrast to these findings. At the Woodinville School Project between June 26 and July 3, 1983 Walsh was the vice president and signed the contract for removal by Savage Enterprises. But Esther Miller was the estimator and the one responsible for solving problems during the course of the work, and Joe Silva was the foreman. Walsh was not present at the site. At the removal project at 1104 Northeast 47th Street, Seattle, Walsh was president but did not do the estimating and, as found by the district court, "was never on the job site while the work was being performed."

We conclude that there was no clear error in the district court's findings of fact that Walsh was the operator on the Sea–Tac and Crab Pot projects, and conclude as a matter of law that the district court correctly required "substantial" control in holding Walsh was "the operator" of these removal projects within the meaning of the Act.

### 4. Substantive Violations of the Act

Walsh makes three contentions. First, that to constitute an "air pollutant" to which emission standards of the Act apply there must exist some "substance or matter which is emitted into or otherwise enters the ambient air." 42 U.S.C. § 7602(g). By the ambient air Walsh contends is meant air not within a building but the unenclosed air outside. He cites *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 904 (7th Cir.1990), which speaks of the emission of pollutants "into the atmosphere." He adds that there was no showing that the emissions here entered the atmosphere, and he draws an analogy with our treatment of state regulations in *Idaho Dep't of Health and Welfare v.*

*United States Dep't of Energy*, 959 F.2d 149, 151 (9th Cir.1992).

Second, he contends that what is prohibited under the Act is action that would "modify" a "stationary source." 42 U.S.C. § 7412(c)(1)(A). A stationary source under the Act is "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3). A modification of a stationary source is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4). Savage Enterprises stripped asbestos-containing material at Sea–Tac and the Crab Pot within what is described as a "negative area enclosure." A negative area enclosure is a containment area in which the air is filtered by a high efficiency particulate filter designed to remove very small particles of asbestos from the air. After filtering, the air is exhausted to the inside of the building. The negative pressure or static pressure in the enclosed area is lower than that of the environment outside the containment barriers. The pressure grading is maintained by moving air from the work area to the environment outside the area via power exhaust equipment at a rate that separates the desired air flow and pressure differential. Walsh contends that when a negative air enclosure is used there is no modification to the existing source which increases the amount of air pollutant emitted by the source.

Third, Walsh notes that Savage Enterprises was required by the regulation to "adequately wet friable asbestos materials" as they were being stripped and after they were stripped "to insure that they remain wet" until they were collected for disposal. 40 C.F.R. § 61.147(c) and (e). Walsh contends that there was no first-hand evidence that the materials removed at Sea–Tac were friable. The particular material removed was not itself any longer available. Walsh points to his own testimony that some of the material removed at Sea–Tac was cementitious or, in other words, had the properties of cement and would not have readily crumbled. He

also contends there was insufficient evidence that the material that was friable was not adequately wet and that there could not have been such proof without evidence of either dust emissions or visible emissions. He points to 40 C.F.R. § 61.141 which defines as "adequately wet" asbestos that is "sufficiently mixed or coated with water or an aqueous solution to prevent dust emissions." He questions the commonsense conclusions of the inspector who found that on rubbing the material with her hands it crumbled and so in her estimation was friable.

■ None of Walsh's arguments as to the substantive violations of the Act are without force. Nonetheless, none of them in the end are persuasive. We consider them in turn with this preamble: Congress has provided that judicial review of the standards set by the EPA must be sought only in the United States Court of Appeals for the District of Columbia within 60 days of the notice of promulgation of the standards. 42 U.S.C. § 7607(b). Walsh challenges this limitation on judicial review, noting that he himself was not even in the asbestos removal business at the time the regulations were promulgated. We take judicial notice, however, that there were many asbestos removal companies in operation at the time of the promulgation of the regulations and that they had motive and opportunity to challenge the regulations if they were unreasonable. There is nothing to prevent Congress from providing a single national forum for the litigation of such standards. *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 284, 98 S.Ct. 566, 572, 54 L.Ed.2d 538 (1978). We turn to Walsh's specific arguments.

■ First, the purpose of the work practice standards for demolition and renovation involving asbestos is "to prevent emissions of particulate asbestos material to the outside area," 40 C.F.R. § 61.147, as Walsh himself contends. The agency charged with enforcing the statute may take steps to prevent asbestos emissions reaching the outside area. To achieve this purpose, the EPA instituted the work practice rules. The regulations were challengeable under the procedures and limits set out in 42 U.S.C. § 7607(b)(1). It is too late for Walsh to challenge them in this enforcement proceeding. *Id.* § 7607(b)(2); *see United States v. Ethyl Corp.*, 761 F.2d 1153, 1155 (5th Cir.1985), *cert. denied*, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986). Walsh's attempt to sidestep the work practice rules by his argument that emissions must reach the outside area fails to disturb the validity of the regulations that he is found to have violated. He is liable for a dry removal without an EPA waiver and for failing to keep asbestos material wet. The question of emission of an air pollutant to the ambient air is not relevant. The violation of the work practice rule violates the statute.

■ Second, "modification" of a source is but one of two bases of liability under 42 U.S.C. § 7412(c)(1). Walsh might be charged with either "modifying" a source, 42 U.S.C. § 7412(c)(1)(A), or with emitting an air pollutant, 42 U.S.C. § 7412(c)(1)(B). The district court ruled that Walsh's violation of work practice standards constituted an emission under 42 U.S.C. § 7412(c)(1)(B), and did not discuss liability based on a "modification" under 42 U.S.C. § 7412(c)(1)(A). Thus, Walsh's argument that there was no modification when he used a negative air enclosure is irrelevant to his liability for emitting an air pollutant.

Independent of its irrelevance, Walsh's argument fails based on the facts of this case. The negative air enclosure did not prevent a modification of the structure at Sea–Tac when there was physical removal of asbestos from the structure. According to testimony at the trial the system in place was inadequate to keep asbestos emissions within the containment area. Inspector Armina Nolan, whose testimony the district court found to be very credible, observed dry asbestos outside the containment area and observed asbestos being tracked through outside hallways. Carolyn Rankin, an engineer employed by the airport, encountered asbestos outside the containment area. Kent Slater, a foreman with Savage Enterprises, testified that the negative enclosure area was inadequate and did not function properly. Sufficient evidence showed that the negative enclosure did not succeed in preventing emissions from the modification of the structure by the removal of the asbestos.

Third, five witnesses testified that the asbestos removed from Sea–Tac was friable: Inspector Nolan, Inspector Rankin, Inspector Davis, and the two Savage Enterprises employees, Slater and Pham. The district court was in a position to determine whether he would believe this testimony or the counter-testimony of Walsh, whom he generally found credible. We are not in a position to second-guess the finding of the district court that the material was friable and not adequately wetted. Again, as to the Crab Pot, inspectors Nolan and Davis testified to friable material found on the site. The district court's conclusion based on this testimony is not clearly erroneous.

Accordingly, the judgment of the district court is **AFFIRMED.**