

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-5-1998

# United States v. Dell'Aquila

Precedential or Non-Precedential:

Docket 96-5761

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Dell'Aquila" (1998). *1998 Decisions.* Paper 183.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/183

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 5, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5761

UNITED STATES OF AMERICA

v.

ANTHONY DELL'AQUILLA, Enterprises and Subsidiaries;
HARRY GRANT; SANDALWOOD CONSTRUCTION
CORPORATION,

Harry Grant, Sandalwood Construction Corporation,
        Appellants

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 88-3232)

ARGUED
October 30, 1997

Before: Nygaard, McKee and Weis, Circuit Judges

(Filed: August 5, 1998)

        Roy Alan Cohen
        Charles E. Erway, III (Argued)
        Toby A. Holbreich
        Porzio, Bromberg & Newman, P.C.
        163 Madison Avenue
        Morristown, NJ 07962-1997

        Attorneys for Appellants

Faith S. Hochberg
United States Attorney
Peter G. O'Malley
Assistant United States Attorney
Susan Handler-Menahem (Argued)
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102

Attorneys for Appellee

OPINION OF THE COURT

McKee, Circuit Judge.

We are asked to review the district court's grant of summary judgment in favor of the United States and against Harry Grant and Sandalwood Corporation. The court ruled that Grant and Sandalwood were liable for violations of the Clean Air Act, 42 U.S.C. S 7401 et seq., ("CAA"), and the National Emission Standard for Hazardous Air Pollutants established for asbestos, 40 C.F.R. pt. 61, subpt. M. ("NESHAP"), as a matter of law, and assessed penalties against Grant and Sandalwood in the amount of $2,975,000 under 42 U.S.C. S 7413(b). That sum represents the maximum fine for each violation for each day the violation existed.

We will affirm the grant of summary judgment in favor of the United States based upon Grant's and Sandalwood's non-compliance with an EPA compliance order for each day they were "operators" beginning on June 29, 1988. However, since we conclude that there is a genuine issue of material fact as to the three visible emissions that were charged, we will vacate that portion of the district court's order that is based upon those three violations, and remand for further proceedings consistent with this opinion. We also conclude that there is a genuine issue of material fact as to whether Grant and Sandalwood functioned as operators under the CAA until September 14, 1988. Finally, we hold that the district court erred in calculating the fine Grant and Sandalwood must pay.

2

Therefore, on remand, the United States must establish the number of days that Grant and Sandalwood functioned as operators, and the district court will recalculate penalties and fines accordingly.

I.

This matter concerns approximately sixty-five acres of waterfront property located at 1301 Hudson Street, Hoboken, New Jersey ("Hoboken property"). It is undisputed that Anthony Dell'Aquilla is the owner of this property. On May 5, 1988, Dell'Aquilla and Grant entered into an Agreement to Form Joint Venture ("Agreement") to develop the Hoboken property. Under the terms of the Agreement, Grant would become the project manager in charge of the "overall management and control of the business and affairs of the venture." App. at 280. The Agreement outlined the responsibilities and representations relevant to the environmental condition of the property. It provided that, in the event that any hazardous environmental condition was discovered on the property, Dell'Aquilla would cure the condition at his own expense and indemnify Grant against any and all "damages, remedial orders, judgments or decrees, and all costs and expenses related thereto." App. at 277. According to Grant, Dell'Aquilla also provided him with copies of correspondence from contractors certifying that the property and buildings on the property had been inspected and were free of asbestos. Id. at 539. The Agreement further provided that Grant would receive a joint ownership interest in the property contingent upon refinancing. However, the refinancing was neverfinalized, and Grant also learned that Dell'Aquilla could not convey clear title so Grant never obtained an ownership interest under the Agreement.

Grant invested time and money developing the Hoboken property in his role as project manager. He and his wife were the majority shareholders in Sandalwood. Sandalwood's responsibilities included hiring engineers and architects to develop the Hoboken property, and contracting for the demolition of the buildings already on the property and removal of the resulting debris. Id. at 164 & 229. Grant

also incorporated Grant Marina Urban Renewal Corporation to participate in the development.

The development of the property began on June 10, 1988, with the demolition of existing buildings. On June 17, 1988, the Environmental Protection Agency (EPA) sent inspectors Robert Fitzpatrick and Jose Rodriguez to the property because the EPA had not been notified of the demolition as required by law. App. at 483. While there, Inspector Fitzpatrick observed insulation that appeared to be asbestos containing material ("ACM") covering several pipes in one of the demolished buildings. He also noticed that the debris from the demolition appeared to contain ACM. Id. at 21-22. His observations were corroborated when subsequent tests performed upon samples taken from the area established they contained asbestos.

Fitzpatrick returned to the Hoboken property several times during the summer of 1988. During these visits, he witnessed numerous violations of state and federal environmental laws. The violations included the continued unauthorized demolition of ACM structures, visible emissions of ACM dust, improper removal of ACM, and inadequate wetting of the ACM which allowed particles to become airborne. On June 29, 1988, the EPA issued a compliance order under S 112 of the CAA in which it commanded Dell'Aquilla, Grant and Sandalwood to comply with all federal asbestos regulations. However, despite the notice, the parties continued the demolition in the same manner that had given rise to the EPA notification.

On July 22, 1988, the government filed a complaint against Dell'Aquilla, Grant and Sandalwood alleging a total of 119 violations of asbestos-related regulations, and seeking injunctive relief and civil penalties under the CAA and NESHAP. Dell'Aquilla settled with the government and agreed to pay a disclosed amount in fines ($400,000). The government then moved for summary judgment against Grant and Sandalwood. Grant and Sandalwood did not dispute the violations except for allegations that visible emissions of asbestos occurred on three dates (June 27, July 7, and July 13, 1988). However, Grant and Sandalwood argued that they were not liable under the regulations because they were not "owners or operators" of

4

the Hoboken property. See 40 C.F.R. S 61.02. The district court held that they were "operators", and found them in violation of the regulations.1

The court imposed the statutory maximum penalty of $25,000 per day for each violation for a total fine of $2,975,000. Grant and Sandalwood filed a motion to amend and alter the judgment seeking to reverse the penalty amount. However, the court refused to reconsider the amount of the penalty because it concluded that Grant had initially failed to submit evidence of his finances. This appeal followed.

Grant and Sandalwood argue that: (1) there are genuine issues of material fact concerning their status as "owners or operators" of the Hoboken property, (2) the government failed to make a prima facie case for each of the 119 violations alleged, and (3) the district court abused its discretion in failing to reconsider the $2,975,000 penalty in light of Grant's financial situation. We have jurisdiction over this appeal pursuant to 28 U.S.C. S1291.2

II.

The CAA was enacted, in part, "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. S 7401(b)(1). In order to meet this objective, Congress authorized the EPA to establish emission standards for enumerated hazardous air pollutants. 42 U.S.C.

_____

1. The district court also denied the government's request for injunctive relief because it concluded that the government had not established that Grant and Sandalwood were currently engaged in or planned to engage in activities which would lead to further violations. D. Ct. Op. at 20.

2. We exercise plenary review. Hamilton v. Leavy, 117 F.3d 742, 745 (3d Cir. 1997) (citation omitted). Summary judgment is appropriate when the pleadings and other submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see also, Bank of Nova Scotia v. Equitable Fin. Management, Inc., 882 F.2d 81, 83 (3d Cir. 1989). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

5

S 7412(d)(1995). The asbestos standards, at 40 C.F.R. pt. 61, subpt. M, establish mandatory standards for the renovation and demolition of a facility that contains asbestos, and for the disposal of asbestos. A violation of this NESHAP constitutes a violation of the CAA. See 42 U.S.C. S 7412.

A. Liability as Operator

The CAA imposes strict liability upon owners and operators who violate the Act. See United States v. B & W Inv. Properties, 38 F.3d 362, 367 (7th Cir. 1994). Therefore, although Grant and Sandalwood argue that Dell'Aquilla and/or his agents led them to believe that any asbestos on the property had properly been removed and all necessary permits had been obtained, see Appellants' Br. at 8-10, those assertions are not relevant to our analysis, and we need not respond.

The CAA defines an "owner or operator" as "any person who owns, leases, operates, controls, or supervises a stationary source." 40 C.F.R. 61.02. A stationary source is "any structure, facility, or installation which emits any air pollutant which has been designated as hazardous by the Administrator." Id. Grant and Sandalwood concede that the property is a "stationary source" and only challenge their status as "owners or operators" of the property.

It is clear that neither Grant nor Sandalwood were owners of the Hoboken property. Under the Agreement, Grant's procurement of refinancing for the property was a condition precedent to the fruition of his ownership interest. In addition, as mentioned above, the contemplated conveyance of an ownership interest under the Agreement never occurred because Dell'Aquilla could not convey clear title. Accordingly, Dell'Aquilla remained the sole owner of the property. However, it is now axiomatic that a non-owner can still be liable as an "operator." Moreover, our determination of whether one is an operator or owner under the CAA must be conducted in a manner consistent with the broad reach of the statute. See, e.g., United States v. Tzavah Urban Renewal Corp., 696 F. Supp. 1013, 1021 (D. N.J. 1988) (" `[O]wner or operator' is defined broadly for purposes of asbestos regulations.").

6

Here, the district court relied in part upon United States v. Walsh, 783 F. Supp. 546 (W.D.Wash. 1991), aff'd, 8 F.3d 1013 (9th Cir. 1993), to conclude that Grant and Sandalwood were not shielded from liability merely because they never acquired legal title. In Walsh, the court opined that a person is strictly liable under the CAA if he or she had "significant or substantial or real control and supervision over a project." Id. at 548. Although we are not bound by the holding in Walsh, we agree with the district court that the analysis in Walsh is correct.

The control and supervision that Grant and Sandalwood exercised over the project was more than sufficient to support the district court's conclusion that they were operators under the CAA. For instance, Grant negotiated the contracts for the demolition work that was done on the project. App. at 183-85. During his deposition, Grant described his role in the project as follows: "I met the [contractors], I review which price is better. We discussed with our people which [sic] better to hire, et cetera, et cetera." Id. at 184. See Tzavah Urban Renewal Corp., 696 F. Supp. at 1021 (finding that defendants who were charged with hiring and firing contractors were "operators" under the CAA). Grant signed the demolition contracts on behalf of Sandalwood and Grant Marina. The contractors he retained were involved with all aspects of the project from demolition to asbestos clean-up. In addition, Grant was regularly on the property and witnessed the demolition of several of the asbestos-infested buildings. App. at 244.

Grant argues that much of what he said during his deposition should have been disregarded because he does not have a strong command of the English language. However, the district court properly rejected that assertion. Grant was represented by counsel during all phases of these proceedings. Moreover, he had a sufficient command of English to enter into an intricate agreement with Dell'Aquilla, incorporate two companies, and negotiate construction contracts as well as contracts with engineers and architects.

Grant clearly possessed "significant or substantial or real control and supervision" and was therefore an "operator" within the meaning of the CAA. Walsh, 783 F. Supp. at

7

548. Even though his formal role as owner or project manager never materialized, he clearly functioned in that capacity as evidenced by the control he exercised over the project. Therefore, the district court properly concluded that he was the functional equivalent of an "owner" or "manager."

Sandalwood attempts to evade liability by shifting responsibility to Grant Marina. Sandalwood argues that even if Grant was an operator of the property, Sandalwood was not an operator because Grant Marina was specifically created to participate in the Hoboken development.3 The precise point at which Grant Marina began to exercise responsibility over the property is unclear. However, it is clear that Sandalwood was in existence prior to Grant Marina and was active in the daily operations of the property. Grant stated that Sandalwood's responsibilities in the project included: "hir[ing] attorney[s], engineer[s], architect[s] or anything like that to work on the site." App. at 163. There is also uncontradicted evidence that Sandalwood continued to be involved in the project after the issuance of the compliance order on June 29, 1988. For example, a check dated July 11, 1988, in the amount of $25,000 payable to cash was signed by Sandalwood, and the checkbook register indicates that the proceeds of that check were intended for one of the contractors. App. at 256. The record also contains a letter dated July 28, 1988, from Sandalwood to L. Corio & Sons, Inc. The letter states, in part, that: "[t]his letter constitutes a modification of the contract between Sandalwood Construction Corp., contractor, and L. Corio and Sons, Inc., sub-contractor, for demolition work at [the Hoboken property]." This letter was signed by Sandalwood, and there is no reference whatsoever to Grant Marina. Id. at 415. Sandalwood clearly exercised sufficient control over the development of the property to qualify as an "operator." See generally, B & W Inv. Properties, 38 F.3d at 367 ("B & W exercised control over the parcel sufficient to bring [it] within the scope of `owner or operator' designation because its name appeared on court papers and on a contract with an asbestos clean-up company."). Thus, the district court correctly concluded

_____

3. Grant Marina was not a named party in this action.

8

that there were no genuine questions of material fact as to the operator status of either Grant or Sandalwood.

The 119 charged violations include a violation for each of the sixty-seven days of non-compliance from June 29, 1988, until the Agreement was terminated on September 14, 1988. Grant testified at his deposition that, to the best of his knowledge, he visited the site each day from the beginning of the demolition until the demolition was completed; however, the record is unclear as to when demolition was completed. Although it may have continued until September 14, 1988, there is nothing to establish that its duration was coterminous with the Agreement. Similarly, although Sandalwood clearly functioned as an operator, this record also fails to establish how long Sandalwood acted in that capacity.

In United States v. Bestfoods, ___ S. Ct. ___, 1998 WL 292076*7 (1998), the Supreme Court stated:

> under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition[of operator] for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

Although the Court was there addressing the definition of "operator" in CERCLA, and not the CAA, the purposes of the two statutes is the same, and the language in question is nearly identical. Accordingly, the Court's gloss on the CERCLA definition is relevant to our inquiry. Grant and Sandalwood were clearly involved with contracts relating directly to the polluting activity beginning with the first notice on June 29, 1988. However, that does not mean that either or both continued to function in that capacity until the Agreement terminated.4 Thus, we conclude that the

_____

4. In United States v. Bestfoods, et al., S. Ct., 1998 WL 292076 (1998), the Supreme Court analyzed the liability of a parent corporation for a

district court erred in assuming that Grant and Sandalwood could be held liable for each violation for every day until September 14, 1988.

Grant and Sandalwood also challenge six violations of 40 C.F.R. S 61.146 concerning notice to the EPA based upon their assertion that they were not "owners or operators" of the Hoboken property. As discussed above, we find they were operators; accordingly, this challenge is without merit. Moreover, as we discuss infra, it was not preserved.

B. Waiver

On appeal, Grant and Sandalwood attempt to argue that the government did not present a prima facie case for 34 demolition related NESHAP violations, and 18 disposal-related violations. See Appellants' Br. at 27-37, Points II & III. The government asserts that this attack has been waived, except insofar as appellants challenge violations for visible emissions related to disposal on June 27, July 7, and July 13, 1998. See Appellee's Br. at 19. Appellants' attempt to counter the government's assertion of waiver by arguing that they "maintained throughout their briefs below that the asbestos NESHAPs did not apply," and that their general assertion before the district court is sufficient to preserve the more specific argument raised here. Reply Br. at 6.

Third Circuit Court of Appeals Local Appellate Rules require that each appellant's brief contain "a designation by reference to specific pages of the appendix or place in the proceedings at which each issue on appeal was raised, objected to, and ruled upon . . . ." 3d Cir. L.A.R. 23.1. Appellants' brief states that the insufficiency of the

_____

subsidy under the analogous Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"). The Court held that a parent corporation can be liable "both directly, when the parent itself operates the facility, and indirectly, when the corporate veil can be pierced under state law." 1998 WL 292076 *4. Although we are not confronted with issues of separate corporate identity, we mention Bestfoods because it illustrates that the issue of Sandalwood's tenure as an operator is not as "clear cut" as the United States suggests.

10

government's prima facie case was raised at "Add-2, pp.3-4, 14." See Appellants' Br. at 2. Those references are to the district court's opinion. At the relevant portions of those pages the district court stated that Grant and Sandalwood "do not contest" several of the government's allegations, see D. Ct. Op. at 4, "nor do the defendants deny the presence of ACM . . . [t]hus, the demolition of structures containing verified ACM and the witnessed emissions support the Court's conclusion that visible emissions of asbestos occurred on all of the days alleged." Id. at 14. The appellants' brief also states the following: "[o]n summary judgment below, the government incorrectly claimed that appellants were not challenging any of the alleged NESHAP violations other than the visible emissions. (CITE) That is incorrect." Appellants' Br. at 31. Appellants apparently had no more success finding a reference where the argument was preserved than we did as no "cite" is provided. Moreover, we have reviewed the Appendix submitted by the appellants in its entirety, and we do not find any assertion sufficient to preserve this issue on appeal.

We have previously noted that, absent exceptional circumstances, an issue not raised in district court will not be heard on appeal. Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 116 (3d Cir. 1992). "Exceptional circumstances have been recognized when the public interest requires that the issue[s] be heard or when a manifest injustice would result from the failure to consider the new issue[s]." Altman v. Altman, 653 F.2d 755, 758 (3d Cir. 1981) (citations omitted). We find no such exceptional circumstances here. Accordingly, appellants have waived much of their challenge to the sufficiency of the government's evidence to support the NESHAP violations. However, the government concedes that appellants did not waive their challenge to the three visible emissions of asbestos in violation of 40 C.F.R. S 61.152(b). Accordingly, we turn our attention to those violations.

C. Visible Emissions

The district court held that the government had established that Inspector Fitzpatrick witnessed visible emissions on June 27, 1988, July 7, 1988, and July 13,

11

1988. The court cites "Plaintiff's Exhibit 5, 73-74, 77-79, 89-90, 92-94" for that finding. D. Ct. Op. at 14. Neither appellants nor the government have included that exhibit in the Joint Appendix filed in this court. We have, however, reviewed Inspector Fitzpatrick's affidavit, and the portions of the transcript from his deposition that are included in the Joint Appendix. That evidence establishes that the inspector saw what he believed to be visible emissions of asbestos on June 27, 1988 (Fitzpatrick Aff. P 7), and July 7, 1988 (Fitzpatrick Aff. P 11), but it does not mention witnessing any emissions on July 13, 1988 (Fitzpatrick Aff. P 12). App. at 22-23. Samples that the inspector took on June 27 and July 7 tested positive for asbestos. Although we find evidence of only two visible emissions, Grant and Sandalwood do not dispute that there were three. Rather, they contend that the government failed to establish as a matter of law that the three emissions were covered by NESHAP. We agree.

Section 61.152(b) of the asbestos NESHAP states that each owner or operator of any source shall "[d]ischarge no visible emissions to the outside air during the collection, processing (including incineration), packaging, transporting, or disposition of any asbestos-containing waste material generated by the source." 40 C.F.R. S 61.149. "Visible emissions" are "any emissions containing particulate asbestos material that are visually detectable without the aid of instruments." 40 C.F.R. S 61.141 (1988).5 Grant and Sandalwood argue that, even though the inspectors saw dust and debris, the government did not establish that the emissions contained asbestos, or even that they came from asbestos-infested buildings. Appellants' Br at 34.

_____

5. The current regulations clarify this definition. "Visible emissions" is currently defined as "any emissions, which are visually detectable without the aid of instruments, coming from RACM or asbestos-containing waste material, or from any asbestos milling, manufacturing, or fabricating operation." 40 C.F.R. S 61.141 (1997). For purposes of this appeal, however, the more ambiguous definition found in the regulations that were in place at the time of the Hoboken property development is applicable.

12

The district court relied upon United States v. Midwest Suspension and Brake, 824 F. Supp. 713, 730 (E.D. Mich. 1993), aff'd, 49 F.3d 1197 (6th Cir. 1995), for support of its conclusion that summary judgment was warranted as to these visible emissions. In Midwest Suspension, the government had proven through circumstantial evidence that visible emissions, as defined under NESHAP, had been observed on three occasions. During the first occasion, an EPA inspector observed emissions while a dumpster was being unloaded at a landfill. Id. at 729. After this emission settled on top of a box, a sample was taken and that sample later tested positive for asbestos. On the second occasion, the government presented evidence that a sample of material that had been lying loose in a dumpster prior to transport tested positive for asbestos. An EPA inspector followed that dumpster as it was being transported and he observed a dust emission from the dumpster while it was being unloaded. Id. The court noted that although that dust was not tested, it could reasonably be inferred that the discharge came from the lose material that had been tested. The last visible emissions observed were discharged from a dumpster as it was being emptied in a landfill. The EPA inspector did not take samples of those emissions, but he testified that the emissions were "rust colored, which suggests that significant component of the emission was shot blast waste." Id. at 730. According to the inspector, this type of waste usually contains asbestos. Based on this evidence, the court concluded that the government had met its burden at trial. See also, United States v. Hugo Key and Son, Inc., 731 F. Supp. 1135, 1271 (D. R.I. 1989) (finding a S 61.141 violation where evidence that friable asbestos material fell to the ground and remained there with no precautions to contain the material).

Here, the inspector saw ACM in dry debris on the ground, app. at 22–23, and contractors loading demolition debris into dumpsters, id. at 23. The debris in the area was not wet down. id. Samples, which later tested positive for asbestos, were taken on June 27 and July 7. However, the samples that were taken were not samples of the "dust" from the emissions. Moreover, the government did not show the proximity of the visible emissions either to the area where the contractors were loading debris or to the area

13

where the asbestos-infested buildings were being demolished. Inspector Fitzpatrick also failed to describe the emissions as containing any specific type of "rust color" waste that may suggest the presence of asbestos. Moreover, unlike Midwest Suspension, there is no indication that the two positive test samples were taken from settled emissions. The evidence does not even establish that the samples were taken in the vicinity of the visual emissions. The inspector's affidavit is certainly consistent with a conclusion that the visible emissions contained asbestos. However, summary judgment requires more than a possibility or even a probability that it was asbestos. The government's proof must be sufficient to establish that fact as a matter of law. The proof here is too tenuous to pass that test. Moreover, we must draw all reasonable inferences in favor of Grant and Sandalwood, the nonmoving parties. Josey v John R. Hollingworth Corp. 996 F. 2d 632, 634 (3d Cir. 1993).

Accordingly, the government did not establish that the visible emissions contained asbestos, and summary judgment as to those violations was inappropriate. See generally, United States v. Owens Contracting Servs., Inc., 884 F. Supp. 1095 (E.D. Mich. 1994) (concluding that there must be some proof that the visible emissions contained asbestos).

III. Maximum Penalty

42 U.S.C. S 7413(b) was amended in 1990 to read, in part, as follows:

> The Administrator shall, as appropriate . . . commence a civil action . . . to assess and recover a civil penalty of not more than $25,000 per day for each violation.

42 U.S.C. S 7413(b) (West 1995) (emphasis added). Prior to the 1990 Amendments, the CAA provided that the civil penalty would not exceed "$25,000 per day of violation." 42 U.S.C. S 7413(b) (West 1988) (emphasis added). Thus, it is not clear whether the pre-Amendment maximum fine of $25,000 could be imposed on each violation for every day of the violation, or if it was to be limited by the number of days the owner/operator was in violation regardless of the

14

number of violations on a given day. However, the district court concluded that either version of the statute allowed it to impose the maximum fine for each violation, for each day the violation existed, and that the 1990 Amendments merely clarified that congressional intent. See D. Ct. Op. at 15. That conclusion is not challenged on appeal.6 Appellants do argue that the district court abused its discretion in determining the amount of the fine, but they do not challenge the court's interpretation of the statute. Since appellants do not challenge that ruling here, we will proceed on the assumption that the 1990 Amendments apply. We will limit our inquiry to whether the court abused its discretion in setting the amount of the fine at the statutory maximum.

42 U.S.C. S 7413(e)(1) provides in relevant part as follows:

> In determining the amount of any penalty to be assessed . . . the administrator or the . . . court shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation . .. payment of the violator of penalties previously assessed for the same violation, the economic benefit of the noncompliance, and the seriousness of the violation.7

(emphasis added). The total amount of the fines resulting from assessing $25,000 per day for each of 119 violations the court found from June 28, 1988 (the date of thefirst compliance order) to September 14, 1988 (the date the Agreement was terminated) was $2,975,000. The district

_____

6. Although we need not decide this issue in this appeal, we note that there is substantial precedent supporting the district court's interpretation. E.g. Midwest Suspension, 824 F. Supp. at 733-34; United States v. A.A. Mactal Constr. Co., 22 Envtl L Rep. 21200 (applying the 1990 amended Act to violations that occurred in 1988 and 1989); Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128 (11th Cir. 1990) (applying a similar provision in the Clean Water Act).

7. The government misquotes this statute in its brief. It sets forth the factors included in the statute, but omits "the economic impact of the penalty on the business," from the quotation. See Appellee's Br. at 36.

court relied upon our holding in Public Interest Research Group of New Jersey, Inc. v Powell Duffryn Terminals, Inc., 913 F.2d 64 (3d Cir. 1990) ("PIRG"), to begin with this maximum amount, and proceeded by determining whether any of the specified considerations in S 7413(e)(1) justified mitigation of that total. The court stated "[w]hen imposing a penalty, courts may start with the statutory maximum and then consider factors in mitigation of the maximum." D. Ct. Op. at 16 (citing PIRG). The court concluded that neither the elaborated factors, nor the interests of justice supported mitigating the fine. The court specifically refused to mitigate the fine based on Grant's bankruptcy.

The Court will not mitigate the civil penalty based upon

> Grant's filing for Chapter 11 Bankruptcy . . . There is nothing to indicate that Grant cannot afford the penalty other than Grant's conclusory statement that he has lost all of his assets. Grant has not submitted tax records or findings of the bankruptcy court regarding his financial condition. Without such financial records, the Court cannot accurately determine that the fine would be too great.

D. Ct. Op. at 19.

Thereafter, Grant filed a motion to amend the judgment under Fed. R. Civ. P. 59(e), and included copious financial records with that motion. However, the district court, accepting the recommendation of the magistrate judge, denied that motion because the records had not been submitted previously, and nothing in the record suggested that the records had been unavailable when the court decided the summary judgment motion. The court stated, "[i]ndeed, defendants admit that the evidence was available, but claim that they did not submit it because they were not on notice that the Court would address both liability and penalty aspects of the case. The record belies this claim." App. at 2. Accordingly, we must address the district court's failure to reconsider the fine based upon the additional financial information.8 However, before addressing that

_____

8. Our standard of review for the district court's denial of the appellants' motion to alter or amend a judgment under Fed. R. Civ. P. 59(e) is for an abuse of discretion because the underlying order was an assessment of monetary penalties. See B & W Properties, 38 F.3d at 368 (citation omitted).

16

issue, we will comment upon the process used by the district court to determine the appropriate amount of the fine.

Courts usually calculate a fine under the CAA by starting with the maximum penalty. See, e.g., B & W Investment Properties, 38 F.3d at 368 ("[I]n considering fines under the Act, courts generally presume that the maximum penalty should be imposed."); Tyson Foods, Inc. 897 F.2d 1128, 1141 ("Upon remand, the district court should first determine the maximum fine. . . . it must reduce the fine in accordance with the factors spelled out in [the statute].").9 As noted above, the district court here relied upon our decision in PIRG to state: "courts may start with the statutory maximum and then consider factors in mitigation of the maximum." D. Ct. Op. at 16. However, although courts may, and frequently do, begin at the maximum, we have never suggested that such a procedure is always appropriate. Moreover, our research has not found any appellate decision that would suggest that method of determining a fine under the Clean Air Act is always the best way of proceeding.

In PIRG, the district court assessed the maximum penalty allowed under the Act and then reduced that amount based upon some of the mitigating factors. We reversed based upon our conclusion that the district court erred in mitigating the fine because of the violator's good faith, and the regulatory agency's inaction. We reasoned that, although such a reduction may be appropriate when it is in the interests of justice, the record before the district court did not support a reduction for the particular violator's good faith nor the "nonfeasance" of the regulatory agency. Id. at 80-1. We did not suggest that courts should always begin a fine assessment at the maximum. There will be instances when doing so will initially set the bar so high

_____

9. Tyson Foods dealt with fines for violations of the Clean Water Act. However, the Clean Water Act and the Clean Air Act are in pari materia, United States v. Stauffer Chemical Co., 684 F.2d 1174 (6th Cir. 1982) aff'd, 464 U.S. 165 (1984), and courts often rely upon interpretations of the Clean Water Act to assist with an analysis under the Clean Air Act. See, e.g., Midwest Suspension, 824 F. Supp. at 733.

that it will remain at a height that is inconsistent with the mitigating factors in S 7413(e)(1) even after it is lowered. Here, for example, the fine of nearly $3,000,000 bore no relationship to the violators' ability to pay. This is contrary to Congress' mandate that courts consider "the economic impact of the penalty on the business." 42 U.S.C. S 7413(e)(1). The fine that is imposed must have some reasonable, and proportionate "nexus" to the violations and the violators. See Midwest Suspension, 49 F.3d at 1204 ("Midwest's argument that the district court did not establish any nexus whatsoever between the violations claimed and the penalties assessed has no merit."). Such a nexus is implicit in Congress' command that courts include within their mitigation analysis "other factors as justice may require." 42 U.S.C. S 7413(e)(1).

Courts can achieve an equitable mitigation (if any is warranted in a particular case) either by starting at the maximum penalty and mitigating it downward based upon the factors in S 7413(e)(1), or simply relying upon those factors to arrive at an appropriate amount without starting at the maximum. The statute only requires that thefine be consistent with a consideration of each of the factors the court is obligated to evaluate.

Here, appellants' financial condition was relevant to a determination of the appropriate penalty, and the district court abused its discretion in refusing to consider it. The court justified its refusal for the reasons stated above, however, the court had a legal obligation to consider each of the factors set forth in the Act. As noted above, Congress stated that a court "shall take into consideration" each of the factors set forth in that Act. 42 U.S.C. S 7413(e)(1). Here, the court's refusal to consider Grant's bankruptcy is inconsistent with that mandate. Accordingly, the court abused its discretion in refusing to consider appellants' financial records. See Midwest Suspension, 824 F. Supp. at 735 (rejecting government's request to adopt a rule of law requiring a violator to have "burden of presenting evidence to support a reduction from the statutory maximum penalty" or pay maximum amount).

Dell'Aquilla settled with the government for $400,000. The evidence that the appellants attempted to introduce via

18

their Rule 59(e) motion could have (if accepted by the court) established their utter inability to pay the fine that was imposed. That fine was nearly 750% greater than the settlement the government accepted from Dell'Aquilla, the owner of the property.10 We do not mean to suggest that the district court was somehow limited by the government's settlement. It may well be that a court would be justified in imposing such a disparate fine because of the policy considerations that favor settlements as well as the particular circumstances in a given prosecution under the CAA. However, the district court should have considered appellants' financial records before concluding that such a disparity was consistent with its obligation to consider the mitigating factors set forth in the statute. Since the court failed to consider appellants' financial condition, we will remand for further proceedings consistent with this opinion. At those proceedings, the court will consider the financial records previously offered by appellants. Since the government may not be able to establish that the three visible emissions constituted violations or that Grant and Sandalwood are liable for all of the period from June 29, 1988 to September 14, 1988, the resulting fine may be smaller than the one originally imposed regardless of how the court calculates the fine. However, any fine that is imposed must be consistent with the command of 42 U.S.C. S 7413(e)(1).

IV.

For the foregoing reasons, we will affirm in part, reverse in part, vacate the court's order as to the penalty, and remand for further consideration.

_____

10. In addition, to Grant's financial problems, including bankruptcy, there is evidence in the record that the economic benefit gained by Grant and Sandalwood was just $100,000 -- the amount expended to the cleanup cost of ACM on the Hoboken property. See Report and Recommendation of the Magistrate Judge at 6.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

20